1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES CONRIQUEZ, JR., | ) 1:09-cv—01003-SKO-HC |
| | ) |
| Petitioner, | ) ORDER SUBSTITUTING ACTING WARDEN |
| | ) DANIEL PARAMO AS RESPONDENT (DOC. |
| v. | ) 47) |
| | ) |
| DANIEL PARAMO, Acting Warden, | ) ORDER DENYING THE SECOND AMENDED |
| | ) PETITION FOR WRIT OF HABEAS |
| Respondent. | ) CORPUS (DOC. 34) |
| | ) |
| | ) ORDER DENYING PETITIONER'S |
| | ) REQUEST FOR AN EVIDENTIARY |
| | HEARING (DOC. 34) |

ORDER DIRECTING THE ENTRY OF
JUDGMENT FOR RESPONDENT AND
DECLINING TO ISSUE A CERTIFICATE
OF APPEALABILITY

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge to conduct all further proceedings in the case, including the entry of final judgment, by manifesting their consent in writings signed by the parties or their representatives and filed by Petitioner on August 24, 2009, and on behalf of Respondent on August 18, 2009.

1    Pending before the Court is the second amended petition

2  (SAP), which was filed on July 21, 2011.

3    I.  Jurisdiction

4    Because the petition was filed after April 24, 1996, the

5  effective date of the Antiterrorism and Effective Death Penalty

6  Act of 1996 (AEDPA), the AEDPA applies in this proceeding.  Lindh

7  v. Murphy, 521 U.S. 320, 327 (1997), cert. denied, 522 U.S. 1008

8  (1997); Furman v. Wood, 190 F.3d 1002, 1004 (9th Cir. 1999).

9    A district court may entertain a petition for a writ of

10 habeas corpus by a person in custody pursuant to the judgment of

11 a state court only on the ground that the custody is in violation

12 of the Constitution, laws, or treaties of the United States.  28

13 U.S.C. §§ 2254(a), 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

14 375 n.7 (2000); Wilson v. Corcoran, 562 U.S. –, –, 131 S.Ct. 13,

15 16 (2010) (per curiam).  Petitioner claims that in the course of

16 the proceedings resulting in his conviction, he suffered

17 violations of his Constitutional rights.  Further, the challenged

18 judgment was rendered by the Superior Court of the State of

19 California for the County of Kern (KCSC), which is located within

20 the territorial jurisdiction of this Court.  28 U.S.C. §§ 84(b),

21 2254(a), 2241(a), (d).

22    At the time the initial petition was filed, Petitioner was

23 incarcerated at the Corcoran State Prison, which is located

24 within the territorial jurisdiction of this Court.  (Doc. 1, 1.)

25 n.6).  Petitioner named the warden of that institution as

26 Respondent.  Although Petitioner was subsequently transferred to

27 another prison, the Court maintains its jurisdiction because

28 "jurisdiction attaches on the initial filing for habeas corpus

relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change." Francis v. Rison, 894 F.2d 353, 354 (9th Cir. 1990) (citing Smith v. Campbell, 450 F.2d 829, 834 (9th Cir. 1971)).

The Court thus concludes that it has jurisdiction over the subject matter of the action and over the person of the Respondent.

II.   Substitution of Respondent

Title 28 U.S.C. § 2242 provides that a petition for writ of habeas corpus shall allege the name of the person who has custody over the applicant.  Rule 2(a) of the Rules Governing Section 2254 Cases in the District Courts (Habeas Rules) provides that if the petitioner is currently in custody under a state court judgment, the petition must name as respondent the state officer who has custody.  A failure to name the proper respondent destroys personal jurisdiction.  Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994).  The warden of the penitentiary where a prisoner is confined constitutes the custodian who must be named in the petition, and the petition must be filed in the district of confinement.  Johnson v. Reilly, 349 F.3d 1149, 1153 (9th Cir. 2003).

At the time the petition was filed, Petitioner was incarcerated at the Corcoran State Prison.  (Doc. 1, 1.)  In the answer, Respondent sought pursuant to Fed. R. Civ. P. 25(d) to substitute Ralph M. Diaz, the Acting Warden of the Petitioner's institution of confinement.  (Doc. 44, 6 n.1.)  However, petitioner was subsequently transferred to the R. J. Donovan State Prison (RJDSP) at San Diego, California.  (Doc. 47.)  The

1  Court notes that the official website of the California

2  Department of Corrections and Rehabilitation (CDCR) reflects that

3  the present acting warden of the RJDSP is Daniel Paramo.

4      Fed. R. Civ. P. 25(d) provides that when a public officer

5  who is a party to a civil action in an official capacity dies,

6  resigns, or otherwise ceases to hold office while the action is

7  pending, the officer's successor is automatically substituted as

8  a party.  The Court may order substitution at any time, but the

9  absence of such an order does not affect the substitution.  Id.

10 Accordingly, it will be ordered that Acting Warden Daniel Paramo

11 be substituted as Respondent.

12      III.  Procedural Summary

13      On May 1, 2007, in KCSC case number SF013296A, Petitioner

14 was convicted at a jury trial of being a prison inmate in

15 possession of a weapon, to wit, a dirk, dagger, or sharp

16 instrument, in violation of Cal. Pen. Code § 4502(a). (SAP 1; LD

17 1, 1-2.)[1]  The trial court found true allegations that Petitioner

18 had two prior convictions for the purpose of the Three Strikes

19 Law.  Petitioner was sentenced to twenty-five years to life to

20 run consecutively to an eight-year term he was serving at the

21 time of the instant offense.  (LD 1, 1-2.)

22      Petitioner appealed his conviction, which was affirmed by

23 the California Court of Appeal, Fifth Appellate District (CCA) in

24 an opinion filed on March 18, 2008.  (LD 1, 1.)

25      A petition for review filed in the California Supreme Court

26 (CSC) was denied without a statement of reasoning or authority on

27

28      [1] "LD" refers to documents lodged by the Respondent in support of the
    answer.

                                    4

1  May 21, 2008.  (LD 2, 1; LD 3.)

2      Petitioner filed a petition for writ of habeas corpus in the
3  KCSC, which denied the petition in a decision setting forth a
4  statement of reasons and citing authorities on October 26, 2009.
5  (LD 4.)

6      Petitioner fled a petition for writ of habeas corpus in the
7  CCA, which denied the petition on June 2, 2010, in a decision
8  setting forth a statement of reasons and citing authorities.  (LD
9  5.)

10     Petitioner filed a petition for writ of habeas corpus in the
11 California Supreme Court (CSC), which denied the petition
12 summarily on February 16, 2011.  (LD 6, LD 7.)

13     On May 19, 2009, Petitioner filed his initial petition,
14 which was transferred to this Court on June 9, 2009.  A first
15 amended petition was filed, and the proceedings were stayed for
16 the purpose of exhaustion of state court remedies as to some
17 claims.  Proceedings continued with the filing of Petitioner's
18 second amended petition (SAP) on July 21, 2011 (doc. 34).
19 Respondent's motion to dismiss Petitioner's fourth and fifth
20 claims as untimely was granted on January 4, 2012.  Respondent
21 filed an answer and supporting documentation on February 21,
22 2012.  Petitioner filed a traverse on March 19, 2012.

23     IV.  Factual Summary

24     In a habeas proceeding brought by a person in custody
25 pursuant to a judgment of a state court, a determination of a
26 factual issue made by a state court shall be presumed to be
27 correct; the petitioner has the burden of producing clear and
28 convincing evidence to rebut the presumption of correctness.  28

U.S.C. § 2254(e)(1); <u>Sanders v. Lamarque</u>, 357 F.3d 943, 947-48 (9th Cir. 2004). This presumption applies to a statement of facts drawn from a state appellate court's decision. <u>Moses v. Payne</u>, 555 F.3d 742, 746 n.1 (9th Cir. 2009). The following statement of facts is taken from the decision of the CCA in <u>People v. James Conriquez, Jr.</u>, case number F052850, filed on March 18, 2008.

FACTS

In the early morning hours of May 15, 2006, Jeffrey Quiram, a correctional officer at the Wasco State Prison in Kern County, was assigned to the receiving and releasing unit of the prison. His work entailed preparing inmates to be transported by bus to different institutions. Defendant was scheduled to be transferred to the California Men's Colony in San Luis Obispo.

Officer Quiram described the procedure for processing inmates who come to the receiving and releasing unit. First they are placed in different cells. They are then strip-searched to ensure they do not possess contraband. Next, they are given paper jumpsuits, boxers, and t-shirts to wear and are placed in a different holding cell. They are then pulled out one at a time, photographed for identification, and sent through a metal detector. Finally, they stand in line and wait for a transportation unit to chain them up to go on the bus.

Officer Quiram first made contact with defendant around 3:00 a.m. Officer Quiram strip-searched defendant. He did not locate any contraband on defendant or observe anything near or around defendant's rectum. Defendant was then issued a paper jumpsuit and was placed in a holding cell.

After Officer Quiram's partner photographed defendant, defendant was sent through the metal detector. When defendant went through the metal detector, it sounded and LED lights illuminated. The LED lights indicated there was something metal around defendant's "waist area."

Officer Quiram instructed defendant to go back through the metal detector one more time. The metal detector sounded again and the LED lights illuminated, indicating the metal was in the same area. Officer Quiram escorted defendant back to a pre-searched holding cell. The cell was searched every night around

6

2:00 a.m. That night, Officer Quiram searched the cell himself and did not locate anything inside the cell. He also inspected it visually before putting defendant in the cell and did not observe anything.

As he was escorting defendant over to the holding cell, Officer Quiram asked defendant "if he had anything on him, and if he had something on him, to go ahead and give it up, before [the officer] could allow him to get on the bus." In response, defendant said he had something in his rectum or "butt, or some slang." After Officer Quiram placed him in the holding cell, he again asked defendant "if he had anything on him, that he needed to give it up, so that he could be sent out on the bus." Defendant said "he had a knife, or blade in his rectum, and [Officer Quiram] said he needed to get it out."

In response, defendant unzipped his jumpsuit, squatted down, and removed the object. Officer Quiram had defendant place the object on the ground in front of him, outside the bars. The object Officer Quiram retrieved was a piece of metal that looked like a blade and was wrapped in plastic. It appeared to have a handle on one end, which was fashioned out of tape and orange, plastic garbage-sack material. The other end of the object was "sharpened to a point." To Officer Quiram, it looked like a "stabbing type weapon."

(LD 1, 2-3.)

V.   Standard of Decision and Scope of Review

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

///

1    Clearly established federal law refers to the holdings, as
2  opposed to the dicta, of the decisions of the Supreme Court as of
3  the time of the relevant state court decision.  Cullen v.
4  Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v.
5  Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S.
6  362, 412 (2000).  It is thus the governing legal principle or
7  principles set forth by the Supreme Court at the pertinent time.
8  Lockyer v. Andrade, 538 U.S. 71-72.

9    A state court's decision contravenes clearly established
10  Supreme Court precedent if it reaches a legal conclusion opposite
11  to, or substantially different from, the Supreme Court's or
12  concludes differently on a materially indistinguishable set of
13  facts.  Williams v. Taylor, 529 U.S. at 405-06.  The state court
14  need not have cited Supreme Court precedent or have been aware of
15  it, "so long as neither the reasoning nor the result of the
16  state-court decision contradicts [it]."  Early v. Packer, 537
17  U.S. 3, 8 (2002).  A state court unreasonably applies clearly
18  established federal law if it either 1) correctly identifies the
19  governing rule but applies it to a new set of facts in an
20  objectively unreasonable manner, or 2) extends or fails to extend
21  a clearly established legal principle to a new context in an
22  objectively unreasonable manner.  Hernandez v. Small, 282 F.3d
23  1132, 1142 (9th Cir. 2002); see, Williams, 529 U.S. at 407.  An
24  application of clearly established federal law is unreasonable
25  only if it is objectively unreasonable; an incorrect or
26  inaccurate application is not necessarily unreasonable.
27  Williams, 529 U.S. at 410.
28  ///

1    A state court's determination that a claim lacks merit
2  precludes federal habeas relief as long as fairminded jurists
3  could disagree on the correctness of the state court's decision.
4  Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011).
5  Even a strong case for relief does not render the state court's
6  conclusions unreasonable.  Id.  To obtain federal habeas relief,
7  a state prisoner must show that the state court's ruling on a
8  claim was "so lacking in justification that there was an error
9  well understood and comprehended in existing law beyond any
10  possibility for fairminded disagreement."  Id. at 786-87.  The
11  standards set by § 2254(d) are "highly deferential standard[s]
12  for evaluating state-court rulings" which require that state-
13  court decisions be given the benefit of the doubt, and the
14  Petitioner bear the burden of proof.  Cullen v. Pinholster, 131
15  S. Ct. at 1398.  Further, habeas relief is not appropriate unless
16  each ground supporting the state court decision is examined and
17  found to be unreasonable under the AEDPA.  Wetzel v. Lambert, -
18  -U.S.--, 132 S.Ct. 1195, 1199 (2012).

19    In assessing under section 2254(d)(1) whether the state
20  court's legal conclusion was contrary to or an unreasonable
21  application of federal law, "review... is limited to the record
22  that was before the state court that adjudicated the
23  claim on the merits."  Cullen v. Pinholster, 131 S. Ct. at 1398.
24  Evidence introduced in federal court has no bearing on review
25  pursuant to § 2254(d)(1).  Id. at 1400.  As previously noted, 28
26  U.S.C. § 2254(e)(1) provides that in a habeas proceeding brought
27  by a person in custody pursuant to a judgment of a state court, a
28  determination of a factual issue made by a state court shall be

9

1  presumed to be correct; the petitioner has the burden of
2  producing clear and convincing evidence to rebut the presumption
3  of correctness.
4      VI.  Admissibility of Petitioner's Out-of-Court Statements
5          Petitioner argues that the statements he made to Officer
6  Quiram were inadmissible because he was not advised of his rights
7  under Miranda v. Arizona, 384 U.S. 436 (1966).
8          A.  Last Reasoned Decision
9          A state has adjudicated a claim on the merits within the
10  meaning of § 2254(d) when it decides the petitioner's right to
11  relief based on the substance of the constitutional claim raised,
12  rather than denying the claim because of a procedural or other
13  rule precluding state court review of the merits.  Lambert v.
14  Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).
15          Here, the CCA rendered a decision on the merits, and the CSC
16  declined to review the CCA's decision.  A state court's decision
17  to deny discretionary review, such as a decision of the
18  California Supreme Court to deny a petition for discretionary
19  review of a state court of appeal's decision on direct appeal in
20  a non-capital case, is not a decision on the merits, but rather
21  is only a determination that the California Supreme Court will
22  not consider the case on the merits.  Williams v. Cavazos, 646
23  F.3d 626, 636 (9th Cir. 2011), cert. grtd. in part,[2] Cavazos v.
24  Williams, --- S.Ct. ----, 2012 WL 104740  (No. 11-465, U.S. Jan
25  13, 2012) (citing Harrington v. Richter, – U.S. -, 131 S.Ct. 770,
26  784-85 (2011); Cal. R. Ct. 8.500; and Campter v. Workers' Comp.
27
28  [2] Certiorari was granted as to the limited issue of whether a habeas petitioner's claim has been "adjudicated on the merits" for purposes of 28 U.S.C. § 2254(d) where the state court denied relief in an explained decision but did not expressly acknowledge a federal-law basis for the claim. Id.

10

Appeals Bd., 3 Cal.4th 679 (1992)).  There is a rebuttable
presumption that where there is one reasoned state judgment
rejecting a federal claim, a later unexplained order upholding
the judgment or rejecting the same claim rests upon the same
ground.  Ylst v. Nunnemaker, 501 U.S. 797, 801-02 (1991).  Thus,
this Court will "look through" the state supreme court's denial
of discretionary review to the DCA decision, which was the last
reasoned state court decision concerning the Miranda issue.  Id.
at 803-04; Williams v. Cavazos, 646 F.3d at 636; Taylor v.
Maddox, 366 F.3d 992, 998 n.5 (9th Cir. 2004).

     B.  The State Court Decision

    The decision of the CCA concerning Petitioner's Miranda
claim was as follows:

    I. Claimed Miranda Violation

> Defendant contends his statements to Officer Quiram
> should not have been admitted at trial because they
> were obtained in violation of *Miranda, supra,* 384 U.S.
> 436. Recognizing this claim was waived by defense
> counsel's failure to object, defendant also contends he
> received ineffective assistance of counsel. FN2 We
> reject both claims based on our conclusion that, on the
> record before us, defendant was not in custody when
> questioned by Officer Quiram. Any restriction of
> movement he suffered when questioned by Officer Quiram
> was based upon the fact that the crime was committed at
> the Wasco State Prison. Accordingly, Officer Quiram was
> not required to administer Miranda warnings and defense
> counsel was not ineffective for failing to object to
> the admission of defendant's statements to the officer.

> > FN2. "To prevail on a claim of ineffective
> > assistance of counsel, the defendant must
> > show counsel's performance fell below a
> > standard of reasonable competence, and that
> > prejudice resulted. [Citations.] When a claim
> > of ineffective assistance is made on direct
> > appeal, and the record does not show the
> > reason for counsel's challenged actions or
> > omissions, the conviction must be affirmed
> > unless there could be no satisfactory
> > explanation. [Citation.] Even where deficient
> > performance appears, the conviction must be

upheld unless the defendant demonstrates prejudice, i.e., that, ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citations.]" *(People v. Anderson* (2001) 25 Cal.4th 543, 569; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Pope* (1979) 23 Cal.3d 412, 426.)

The United States Supreme Court held in *Mathis v. United States* (1968) 391 U.S. 1, 4-5 *(Mathis)* that a prison inmate incarcerated for an offense different from the one being investigated is entitled to *Miranda* warnings. As stated in *People v. Fradiue* (2000) 80 Cal.App.4th 15 *(Fradiue)*, however, even though the *Mathis* holding clearly granted the protections of *Miranda* to prison inmates, several lower federal courts have delineated an exception to this general rule "where the interrogation is conducted under circumstances where no restraint is placed upon the inmate over and above that associated with his prisoner status." *(Fradiue, supra,* 80 Cal.App.4th at p. 19, italics added.) *Fradiue* cited in particular *Cervantes v. Walker* (9th Cir.1978) 589 F.2d 424 *(Cervantes)* for the propositions that the usual test of whether a reasonable person would have felt free to leave was not useful in the inmate context and that Miranda warnings were not required in all investigatory prison interrogations. *(Fradiue, supra*, 80 Cal.App.4th at pp. 19-20.)

*Cervantes* analogized the investigatory questioning of an inmate to the type of on-the-scene questioning that occurs when police attempt to determine whether a crime has been committed and which does not require Miranda warnings. *(Cervantes, supra,* 589 F.2d at p. 427, citing *Miranda, supra,* 384 U.S. at pp. 477-478.) *Cervantes* stated that any other view would result in the illogical position of affording greater protection to prisoners than to persons not incarcerated. *(Cervantes, supra,* 589 F.2d at p. 427.) In order to *reconcile Mathis* with the principles of *Miranda, Cervantes* named four factors to consider in determining whether some extra degree of restraint was placed upon an inmate to force him to respond to police questioning: (1) the language used to summon the inmate for questioning; (2) the physical surroundings of the interrogation; (3) the extent to which the inmate is confronted with evidence of his guilt; and (4) the additional pressure exerted to detain him. *(Cervantes, supra*, 589 F.2d at p. 428.)

In the instant case, defendant was not summoned for questioning but was stopped from advancing to the bus

for a prison transfer after he twice set off the metal
detector. The location of the brief questioning was
somewhere between the metal detector and the holding
cell to which defendant was escorted and then the
questioning was repeated once defendant was inside the
cell; an environment not out of the ordinary for an
inmate such as defendant. The extent to which defendant
was confronted with evidence of his guilt was not
extensive. Officer Quiram merely asked defendant if
he had anything on him and stated, matter-of-factly,
that if defendant did have something, he would have
to give it up before he could be allowed on the bus.
Finally, there was no additional pressure exerted on
defendant over and above his already existent confinement
to prison. The evidence indicates that the manner in
which defendant was escorted to a holding cell was in
accordance with normal prison procedures.

The record thus shows that defendant was questioned in
the context of an on-the-scene investigation, and there
is no evidence his movements were curtailed to any
degree over and above that associated with his status
as an inmate of the Wasco State Prison. We therefore
conclude that, under the facts of this case, defendant
was not in custody when he spoke with Officer Quiram
and the officer was not required to administer Miranda
warnings before he questioned defendant. Accordingly,
defendant's related claim that defense counsel rendered
ineffective assistance by failing to object must be
rejected; counsel undoubtedly realized an objection
would have been unavailing. FN3

> FN3. As defendant notes, in response to the
> People's in limine motion to admit
> defendant's statements and resolve any
> Miranda issues, defense counsel indicated he
> did not think there was a Miranda issue
> because defendant's statement "would be an
> admission prior to any real investigation
> into it" and agreed with the court's
> statement "[s]o it's not a statement made
> during a custodial detention where there was
> an interrogation, so far as you can tell...."
> In light of the above authorities, defense
> counsel's assessment of the issue was not
> unreasonable and his failure to object on
> Miranda grounds did not demonstrate
> professional incompetence.

(LD 1, 3-6.)

    C.  Analysis

    Under §2254(d)(1), "clearly established Federal law, as

determined by the Supreme Court of the United States" includes

13

1  only the Supreme Court's decisions as of the time of the relevant
2  state court adjudication on the merits.  Cullen v. Pinholster,
3  563 U.S. - , 131 S.Ct. at 1399.  A review of the key decisions
4  existing at the time of the pertinent state court decisions in
5  Petitioner's case shows that it was not clearly established by
6  decisions of the Supreme Court that incarceration necessarily
7  amounts to custody in violation of  Miranda v. Arizona, 384 U.S.
8  436 (1966).

9      In Mathis v. United States, 391 U.S. 1 (1968), Miranda was
10 held applicable to federal agents' interrogation of a state
11 prisoner concerning fraudulent tax refund claims where the
12 prisoner was incarcerated on state charges.  The Court concluded
13 that the fact that the reason for the custody was distinct from
14 the purpose of the investigation did not render Miranda
15 inapplicable.  Id. at 4-5.

16     However, in Illinois v. Perkins, 496 U.S. 292 (1990), the
17 Court held that the coercive atmosphere against which the Miranda
18 protocol was designed to protect was not present when an
19 undercover informant questioned a prisoner in state prison.  The
20 Court reasoned that the essential elements of a police-dominated
21 atmosphere, privacy permitting incommunicado interrogation, and
22 compulsion were not present where an inmate spoke freely with one
23 believed to be a fellow inmate.  Id. at 295-96.  The Court
24 emphasized that Miranda need be strictly enforced only in those
25 situations in which concerns related to inherently compelling
26 pressures were implicated.  Id. at 296.  In a conversation with
27 one believed to be a fellow inmate, there was no basis for fear
28 of reprisal for remaining silent or hope for more lenient

1    treatment.  Id. at 296-97.  The Court expressly rejected the

2    argument that Miranda warnings were required whenever a suspect

3    is in custody in a technical sense and converses with someone who

4    happens to be a government agent; it noted that the bare fact of

5    custody might not in every instance require warnings even when a

6    suspect is aware that he is speaking to an official.  Id. at 299-

7    300.

8         Decisions rendered after Petitioner's conviction reflect

9    that the Supreme Court's view has been, and continues to be, that

10   incarceration alone, or technical custody, is not sufficient to

11   constitute an inherently coercive environment requiring Miranda

12   advisements.  In Maryland v. Shatzer, 130 S.Ct. 1213 (2010), the

13   Court considered the rule of  Edwards v. Arizona, 451 U.S. 477

14   (1981), a judicially prescribed prophylaxis to prevent an

15   increased risk of coercion that would result from persistent

16   attempts by law enforcement to interrogate a suspect in

17   combination with prolonged police custody.  Pursuant to the

18   Edwards rule, a suspect who has invoked his right to the presence

19   of counsel during custodial interrogation is not subject to

20   further interrogation until either counsel has been made

21   available or the suspect himself initiates further exchanges with

22   the police.  The Court determined that an inmate's release into

23   the general prison population for over two weeks after he had

24   invoked his right to counsel constituted a break in Miranda

25   custody that warranted admission of inculpatory statements made

26   by the inmate during renewed interrogation while he remained in

27   custody and after he waived his Miranda rights.  Id. at 1215-

28   1216.  The Court reasoned that the break undercut the conclusive

                                  15

presumption of the Edwards rule that a waiver of rights in
response to a subsequent police attempt at custodial
interrogation was involuntary; it was of sufficient duration to
dissipate the coercive effects of the initial Miranda custody.
Id. at 1222-23.

Regarding the fact that the inmate was incarcerated
throughout the multiple interrogations, the Court distinguished
Miranda or "interrogative" custody from incarceration pursuant to
a conviction. Id. at 1225 n.8. It noted that the elements of
isolation, unfamiliarity of surroundings, police domination, and
prolongation of custody are absent from the circumstances of a
prisoner's remaining in the general population of a prison. Id.
at 1220-21, 1224-25. The Court expressly noted that it had never
decided whether incarceration constituted custody for Miranda
purposes, and that it had explicitly declined to address the
issue in previous cases. Id. at 1224. The Court reiterated that
whether incarceration constitutes Miranda custody depends upon
whether it exerts the danger of coercion that results form the
interaction of custody and official interrogation. Id. Although
all forms of incarceration constitute a restraint on freedom of
movement associated with a formal arrest, this is "only a
necessary and not a sufficient condition for Miranda custody."
Id.[3]

_____

[3] The Court stated in pertinent part:

Here, we are addressing the interim period during which a suspect
was not interrogated, but was subject to a baseline set of
restraints imposed pursuant to a prior conviction. Without
minimizing the harsh realities of incarceration, we think lawful
imprisonment imposed upon conviction of a crime does not create
the coercive pressures identified in *Miranda*.

Interrogated suspects who have previously been convicted of crime

1    In <u>Howes v. Fields</u>, 132 S.Ct. 1181 (2012), the Court held

2  that an inmate was not taken into custody for purposes of <u>Miranda</u>

3  when he was escorted by armed officers from his cell and

4  interviewed in an average-sized, well-lit conference room for

5  five to seven hours and past his bedtime within the prison by

6  sheriff's deputies about criminal conduct committed outside the

7  prison, where he was not physically restrained, threatened,

8  advised of his <u>Miranda</u> rights, or advised that he was free to

9  decline to speak but was told that he could return to his cell

10 whenever he wanted and was offered food and water.  <u>Id.</u> at 1185-

11 86.  The Court rejected the argument that it had clearly

12 established in <u>Mathis v. United States</u> or its other precedents

13 that <u>Miranda</u> warnings must be administered when law enforcement

14 officers remove an inmate from the general prison population and

15 interrogate him regarding criminal conduct that took place

16 outside the jail or prison.  <u>Id.</u> at 1187.  The Court reiterated

17 its holding in <u>Mathis</u> that a prisoner who otherwise meets the

18 _____

19      live in prison. When they are released back into the general
        prison population, they return to their accustomed surroundings
20      and daily routine—they regain the degree of control they had over
        their lives prior to the interrogation. Sentenced prisoners, in
21      contrast to the *Miranda* paradigm, are not isolated with their
        accusers. They live among other inmates, guards, and workers, and
22      often can receive visitors and communicate with people on the
        outside by mail or telephone.

23      Their detention, moreover, is relatively disconnected from their
        prior unwillingness to cooperate in an investigation. The former
24      interrogator has no power to increase the duration of
        incarceration, which was determined at sentencing. (Footnote
25      omitted.)  And even where the possibility of parole exists, the
        former interrogator has no apparent power to decrease the time
26      served. This is in stark contrast to the circumstances faced by
        the defendants in *Edwards, Roberson, and Minnick*, whose continued
27      detention as suspects rested with those controlling their
        interrogation, and who confronted the uncertainties of what final
28      charges they would face, whether they would be convicted, and what
        sentence they would receive.

130 S.Ct. at 1225.

1  requirements for Miranda custody is not taken outside the scope
2  of Miranda by either the fact that a criminal investigation had
3  not yet been commenced at the time of the interview or that the
4  prisoner was incarcerated for an unconnected offense.  Id. at
5  1188.  The Court expressly stated that neither Miranda nor Mathis
6  held that imprisonment, in and of itself, is sufficient to
7  constitute Miranda custody.  Id.  The Court characterized its
8  holdings, including Illinois v. Perkins, as having "repeatedly
9  declined to adopt any categorical rules with respect to whether
10  the questioning of a prison inmate is custodial."  Id.  The Court
11  reiterated that the freedom-of-movement test was only a necessary
12  and not a sufficient condition for Miranda custody.  Id. at 1190.
13  The Court restated its test concerning Miranda custody as first,
14  a determination of whether in light of all the objective
15  circumstances surrounding the interrogation, a reasonable person
16  would have felt that or she was not at liberty to terminate the
17  interrogation and leave, followed by a determination of whether
18  the relevant environment presents the same inherently coercive
19  pressures as the type of station house questioning at issue in
20  Miranda.  Id. at 1189-90.

21      The Court concludes that contrary to Petitioner's argument,
22  at the time of the pertinent state court decision, it was not
23  clearly established federal law within the meaning of
24  § 2254(d)(1) that Petitioner's statements made during questioning
25  within the prison were necessarily obtained in violation of
26  Miranda v. Arizona.

27      Here, the state court acknowledged the holding of Mathis and
28  other federal cases that considered the nature and quality of the

restraints upon a prison inmate who is being interrogated.  The
state court considered the relevant circumstances, including the
fact that the impetus for questioning arose during a prison
transfer, and thus the guard's questioning was analogous to on-
the-scene questioning concerning whether a crime had been
committed.  The questioning was brief and occurred in an ordinary
environment for a prison inmate.  It was reasonable for the state
court to conclude that there was no extensive confrontation of
the inmate; only the routine scan by the metal detector indicated
the likelihood that Petitioner carried contraband.  The state
court noted that the procedure used to escort Petitioner to a
holding cell appeared to be the regular prison procedure, and the
focus was not Petitioner's misconduct, but rather preparing
Petitioner to travel to another institution in a manner that was
consistent with the safety of all the inmates.  The state court
considered the pertinent circumstances and concluded that there
was no additional pressure or coercion exerted on the Petitioner
beyond his underlying confinement in prison.

     As the foregoing review of the relevant Supreme Court
decisions demonstrates, the state court's analysis and conclusion
that Petitioner was not in custody for the purposes of Miranda
was not contrary to, or an unreasonable application of, Supreme
Court precedent that was clearly established at the time.

     In the traverse, Petitioner argues that because the Supreme
Court had not clearly established when Miranda warnings were
required in the prison context, the state court's decision is
contrary to, or an unreasonable application of, clearly
established federal law.  Petitioner's conclusion does not follow

1    from the absence of a precise decision on point.  Further, as the

2    foregoing analysis shows, the state court reasonably applied

3    <u>Miranda</u> and its progeny by considering the totality of the

4    pertinent circumstances to determine the extent of any coercion

5    exerted on the Petitioner.

6         In sum, the state court's decision denying Petitioner's

7    <u>Miranda</u> claim was not contrary to, or an unreasonable application

8    of, clearly established federal law.  Accordingly, Petitioner's

9    <u>Miranda</u> claim will be denied.

10        VII.   <u>Ineffective Assistance of Counsel</u>

11        Petitioner contends that his trial counsel was ineffective

12   for failing to move to exclude Petitioner's statements or to

13   oppose the prosecutor's in limine motion to introduce

14   Petitioner's statements as admissions and to resolve any <u>Miranda</u>

15   issues.  (Pet. 29-31.)  Respondent addresses this issue in the

16   answer.  (Ans. 15.)

17        The law governing claims concerning ineffective assistance

18   of counsel is clearly established for the purposes of the AEDPA

19   deference standard set forth in 28 U.S.C. § 2254(d).  <u>Premo v.</u>

20   <u>Moore</u>, –U.S. –, 131 S.Ct. 733, 737-38 (2011); <u>Canales v. Roe</u>, 151

21   F.3d 1226, 1229 n.2 (9th Cir. 1998).

22        To demonstrate ineffective assistance of counsel in

23   violation of the Sixth and Fourteenth Amendments, a convicted

24   defendant must show that 1) counsel's representation fell below

25   an objective standard of reasonableness under prevailing

26   professional norms in light of all the circumstances of the

27   particular case; and 2) unless prejudice is presumed, it is

28   reasonably probable that, but for counsel's errors, the result of

                                    20

1  the proceeding would have been different.  <u>Strickland v.</u>

2  <u>Washington</u>, 466 U.S. 668, 687-94 (1984); <u>Lowry v. Lewis</u>, 21 F.3d

3  344, 346 (9th Cir. 1994).  A petitioner must identify the acts or

4  omissions of counsel that are alleged to have been deficient.

5  <u>Strickland</u>, 466 U.S. at 690.  This same standard is applied on

6  direct appeal and in a motion for a new trial. <u>Id.</u> at 697-98.

7      In determining whether counsel's conduct was deficient, a

8  court should consider the overall performance of counsel from the

9  perspective of counsel at the time of the representation.

10 <u>Strickland</u>, 466 U.S. at 689.  There is a strong presumption that

11 counsel's conduct was adequate and within the exercise of

12 reasonable professional judgment and the wide range of reasonable

13 professional assistance.  <u>Id.</u> at 688-90.  The challenger's burden

14 is to show "that counsel made errors so serious that counsel was

15 not functioning as the 'counsel' guaranteed the defendant by the

16 Sixth Amendment."  <u>Id.</u> at 687.

17     In determining prejudice, a reasonable probability is a

18 probability sufficient to undermine confidence in the outcome of

19 the proceeding.  <u>Strickland</u>, 466 U.S. at 694.  In the context of

20 a trial, the question is whether there is a reasonable

21 probability that, absent the errors, the fact finder would have

22 had a reasonable doubt respecting guilt.  <u>Id.</u> at 695.  This Court

23 must consider the totality of the evidence before the fact finder

24 and determine whether the substandard representation rendered the

25 proceeding fundamentally unfair or the results unreliable.  <u>Id.</u>

26 at 687, 696.

27     Where the state court has applied the correct, clearly

28 established federal law to a claim concerning the ineffective

assistance of counsel, a federal district court analyzes the

claim under the "unreasonable application" clause of

§ 2254(d)(1), pursuant to which habeas relief is warranted where

the correct law was unreasonably applied to the facts. <u>Weighall</u>

<u>v. Middle</u>, 215 F.3d 1058, 1062-62 (2000) (citing <u>Williams v.</u>

<u>Taylor</u>, 529 U.S. 362 (2000)).

The Supreme Court has described the high bar presented by

§ 2254(d)(1) for prevailing on a claim of ineffective assistance

of counsel:

> "To establish deficient performance, a person
> challenging a conviction must show that 'counsel's
> representation fell below an objective standard of
> reasonableness.' [<u>Strickland</u>,] 466 U.S., at 688 [104
> S.Ct. 2052]. A court considering a claim of ineffective
> assistance must apply a 'strong presumption' that
> counsel's representation was within the 'wide range' of
> reasonable professional assistance. <u>Id.</u>, at 689 [104
> S.Ct. 2052]. The challenger's burden is to show 'that
> counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant
> by the Sixth Amendment.' <u>Id.</u>, at 687 [104 S.Ct. 2052].
>
> "With respect to prejudice, a challenger must
> demonstrate 'a reasonable probability that, but for
> counsel's unprofessional errors, the result of the
> proceeding would have been different.' ...
>
> " 'Surmounting <u>Strickland's</u> high bar is never an easy
> task.' <u>Padilla v. Kentucky</u>, 559 U.S. ----, ---- [130
> S.Ct. 1473, 1485, 176 L.Ed.2d 284] (2010). An
> ineffective-assistance claim can function as a way to
> escape rules of waiver and forfeiture and raise issues
> not presented at trial [or in pretrial proceedings],
> and so the <u>Strickland</u> standard must be applied with
> scrupulous care, lest 'intrusive post-trial inquiry'
> threaten the integrity of the very adversary process
> the right to counsel is meant to serve. <u>Strickland</u>, 466
> U.S., at 689-690 [104 S.Ct. 2052]. Even under de novo
> review, the standard for judging counsel's
> representation is a most deferential one. Unlike a
> later reviewing court, the attorney observed the
> relevant proceedings, knew of materials outside the
> record, and interacted with the client, with opposing
> counsel, and with the judge. It is 'all too tempting'
> to 'second-guess counsel's assistance after conviction
> or adverse sentence.' <u>Id.</u>, at 689 [104 S.Ct. 2052]; see
> also <u>Bell v. Cone</u>, 535 U.S. 685, 702, 122 S.Ct. 1843,

152 L.Ed.2d 914 (2002); <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. <u>Strickland</u>, 466 U.S., at 690, 104 S.Ct. 2052.

"Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both 'highly deferential,' <u>id.</u>, at 689 [104 S.Ct. 2052]; <u>Lindh v. Murphy</u>, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, <u>Knowles</u>, 556 U.S., at ----, 129 S.Ct., at 1420. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ---- [129 S.Ct., at 1420]. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard."

<u>Premo v. Moore</u>, -U.S. -, 131 S.Ct. at 739-40 (quoting <u>Harrington v. Richter</u>, –U.S.–, 131 S.Ct. 770 (2011)).

Here, the state court concluded that Petitioner was not in custody and that <u>Miranda</u> warnings were not required; thus, counsel's failure to seek to exclude the evidence was not unreasonable or substandard.

As the foregoing analysis demonstrates, Petitioner's <u>Miranda</u> claim lacked merit. If counsel had moved to exclude Petitioner's statements, exclusion would not have been legally required. The failure to make a motion which would not have been successful or was otherwise futile does not constitute ineffective assistance of counsel. <u>James v. Borg</u>, 24 F.3d 20, 27 (9th Cir. 1994).

Accordingly, the Court concludes that the state court's decision denying Petitioner's Sixth and Fourteenth Amendment claim of ineffective assistance of counsel was not contrary to,

1   or an unreasonable application of, clearly established federal

2   law.  Therefore, Petitioner's claim that counsel was ineffective

3   for failing to object to the introduction of Petitioner's

4   statements pursuant to <u>Miranda v. Arizona</u> will be denied.

5       VIII.  <u>Prosecutorial Misconduct</u>

6       Petitioner argues that the prosecutor committed prejudicial

7   misconduct and violated Petitioner's right to due process of law

8   by misstating the reasonable doubt standard and by vouching for

9   the sole prosecution witness.

10      A.   <u>The State Court Decision</u>

11      The pertinent part of the CCA's decision is as follows:

12      II. Claimed Prosecutorial Misconduct

13      Next, defendant contends the prosecutor committed
        prejudicial misconduct by misstating and thereby
14      lowering the burden of proof and by improperly vouching
        for the prosecution witness during closing argument.
15      Again acknowledging he waived his claims by failing to
        object below, defendant contends defense counsel
16      rendered ineffective assistance. We disagree.

17      A. Misstating the Burden of Proof

18      During final argument, the prosecutor made the
        following statements regarding reasonable doubt (the
19      comments defendant finds objectionable are italicized):
        "Reasonable doubt. [¶] I am sure [defense counsel] is
20      gonna get up and he's gonna talk about the burden of
        proof, beyond a reasonable doubt, and I understand
21      that, that is my burden and I accept that, and I submit
        to you that I've proven it beyond a reasonable doubt,
22      that the defendant possessed the weapon. [¶] The
        definition says that it's not a mere possible doubt,
23      it's not, what if? [¶] It's not hypothetical. [¶] It's
        not maybe. [¶] *It's that state of the case which, after*
24      *all of the evidence, that you have compared and*
        *considered, leaves you in a state of mind that you*
25      *cannot say you don't have an abiding conviction of the*
        *truth.* [¶] What that means to me is, a week from now,
26      you can look yourself in the mirror and say, yeah, I
        still think he did it. [¶] That's reasonable. [¶] *It's*
27      *a standard that is used every day in every criminal*
        *case across the nation. [¶] It's not insurmountable,*
28      *and not impossible, and it boils down to your common*
        *sense.* [¶] Was he in prison? [¶] And did he have a

24

weapon? [¶] And those are really the two elements,
that's what I'm required to prove."

In rebuttal, the prosecutor argued: "They want you to
believe that [Officer Quiram] lied about everything.
[¶] Because that's the bottom line, that is what it
comes down to. [¶] He would have to have been lying
about the metal detector. [¶] He had to have been lying
about his statement, or at least very confused. [¶] He
had to be lying about the search of the cell. [¶] ...
[¶] The only evidence that you heard from the witness
stand is that two people had keys. [¶] Officer Quiram
and his partner. [¶] And from the time he searched the
cell at 2:00 a.m., until he put the defendant in it,
nobody was in there. [¶] But the defense wants you to
speculate. [¶] If you go on that issue, whether or not
it's possible to conceal a weapon, they want you to
guess. [¶] *Well, that's hypothetical, that's maybe,
it's not reasonable doubt.* [¶] Look at that
instruction. [¶] *It's not probable, it's not maybe, it
has to be above that.* [¶] Now, ladies and gentlemen,
reasonable is the burden. [¶] *The important thing to
remember is, it's used every single day across the
country. [¶] And you see the news channels, you see the
newspapers, people are convicted every single day in
courtrooms across America. [¶] Why? [¶] Because
reasonable doubt is not insurmountable, it's a higher
level of proof, but it is proveable. [¶] If it wasn't,
no one would go to prison, we wouldn't have a prison
system. [¶] No one would be convicted.* [¶] So, the
bottom line, ladies and gentlemen is, do you believe
Officer Quiram?"

Defendant contends that the prosecutor's comments had
the effect of lowering the prosecutor's burden of proof
by equating the reasonable doubt standard with "common
sense" and the type of standard people use "every day"
in making decisions. Defendant relies principally upon
*People v. Nguyen* (1995) 40 Cal.App.4th 28 *(Nguyen)*.

In *Nguyen*, the prosecutor made the following statements
to the jury during summation: "'The standard is
reasonable doubt. That is the standard in every single
criminal case. And the jails and prisons are full,
ladies and gentlemen. [¶] It's a very reachable
standard that you use every day in your lives when you
make important decisions, decisions about whether you
want to get married, decisions that take your life at
stake when you change lanes as you're driving. If you
have reasonable doubt that you're going to get in a car
accident, you don't change lanes. [¶] So it's a
standard that you apply in your life. It's a very high
standard. And read that instruction, too. I won't
paraphrase it because it's a very difficult instruction,
but it's not an unattainable standard. It's the standard
in every single criminal case.'" (*Nguyen, supra*, 40

25

Cal.App.4th at p. 35.)

The Nguyen court held that the prosecutor's argument
was improper and "strongly disapprove[d] of arguments
suggesting the reasonable doubt standard is used in
daily life to decide such questions as whether to
change lanes or marry." (Nguyen, supra, 40 Cal.App.4th
at p. 36.) The court further held that the improper
argument was harmless because the prosecutor directed
the jury to read the reasonable doubt instruction and
the jury was correctly instructed on the standard. (Id.
at pp. 36-37.) For the same reasons, the failure of
defense counsel to object to the prosecutor's
statements did not constitute ineffective assistance of
counsel. (Id. at p. 37.)

The prosecutor's statements in this case are very
different from the remarks at issue in Nguyen. Here the
prosecutor did not equate application of the reasonable
doubt standard to decisions jurors make in daily life
or compare the jury's task to any specific decision.
Rather, he stated accurately that the reasonable doubt
standard was used every day in criminal cases and
described it as a higher level of proof. We also
disagree with defendant that the prosecutor's reference
to common sense improperly equated the reasonable doubt
standard with everyday decisionmaking. When the
prosecutor's remark is read in context, it becomes
clear the prosecutor was arguing that the jury could
use its common sense to determine that the facts shown
by the prosecution's evidence satisfied the reasonable
doubt standard, not that common sense could substitute
for the reasonable doubt standard. This was fair
argument. Finally, the prosecutor told the jury to look
at the court's instruction on reasonable doubt and the
court instructed the jury on the proper standard.
Nguyen therefore leads us to conclude no rational juror
would have been misled by the prosecutor's argument,
and that any deficiency in defense counsel's failure to
object was not prejudicial. (Nguyen, supra,
40 Cal.App.4th at pp. 36-37.)

In addition, we reject, as without merit, defendant's
brief assertion that the prosecutor erroneously defined
"reasonable doubt" when he stated: "It's that state of
the case which, after all of the evidence, that you
have compared and considered, leaves you in a state of
mind that you cannot say you don't have an abiding
conviction of the truth." When viewed in context, it is
clear the prosecutor was not defining the phrase
"reasonable doubt" but was trying to describe what the
jury's state of mind would be if it found defendant
guilty beyond a reasonable doubt. The prosecutor's use
of negatives may have rendered his statement confusing
but it was not a misstatement of the law.

B. Vouching for the Witness

In closing argument, the prosecutor made the following comments regarding the circumstance that Officer Quiram was the sole prosecution witness and the prosecutor's anticipation that the defense was going to challenge whether his testimony was enough to establish defendant's possession of the weapon (challenged comments are again italicized): "And some of you may be thinking, well, with only one witness, how could I find 'em guilty with just one witness? [¶] The law says that you can. [¶] ... [¶] What they are going to argue about is, did he possess the weapon or not? [¶] So, that's the decision you are going to have to make, when you go back into the jury room. [¶] Did he have the weapon or not? [¶] And the only evidence that you have heard, as I have indicated before, is that he did. [¶] ... [¶] So, the only evidence that you have is Officer Quiram's testimony. [¶] So, then, the question becomes, do you believe him? [¶] And it comes down to that. [¶] ... [¶] *So, I would submit to you, he has no reason to lie. [¶] I would also submit to you, he works for the state. [¶] It's not an easy job to come by, lots of people would like those kinds of working hours, maybe not his, but the benefits, retirement, everything, you know, that we know as citizens that public employees get, why would he lie for him? [¶] One defendant. [¶] When he has contact with hundreds . [¶] No one case is worth his credibility.* [¶] So, I submit to you, ladies and gentlemen, that he told the truth, told you what he could remember, told you the facts and the evidence, and you need to find the defendant guilty."

As the prosecutor predicted, the defense in closing argument tried to raise doubts as to Officer Quiram's credibility. Defense counsel suggested that it was not physically possible for defendant to have concealed the knife in his rectum. Defense counsel suggested that, contrary to the prosecutor's argument, Officer Quiram's job actually provided him an incentive to lie: to protect his job. Defense counsel suggested a more plausible theory was that the knife was in the holding cell the whole time and that Officer Quiram failed to discover it when he conducted his regular search of the cell at 2 a.m. To cover up his own failure to discover the knife, he placed the blame on defendant. FN4

> FN4. For example, defense counsel argued: "Now, there was some suggestion that Mr., or, Correctional Officer Quiram, he has no reason to lie, why would he lie? [¶] Well, at first blush, I say, yeah, you are right, until he said it, I hadn't thought about it, but, he said it, so, I thought about it, let's see, great job, great benefits, he probably would like to make sure he has those tomorrow. [¶]

And if you are the guy responsible for the
two a.m. sweep of the cells, and you log that
sweep, and there is a knife found in one of
those cells, someone has got to be blamed.
[¶] ... [¶] Someone has got to be blamed. [¶]
It's either Mr. Quiram, or someone else. [¶]
... [¶] I don't think it's [a case] that goes
with proof beyond a reasonable doubt. [¶] Too
many open questions, protecting his job, it
doesn't make sense. [¶] I mean, things do
actually have to make sense. [¶] A lot of us
think, oh, he must have been guilty, that
makes sense. [¶] When the reality is, does it
make sense that a man could have that thing
in his rectum ... ? [¶] ... [¶] Could a
weapon have been missed, even from his two
o'clock sweep? [¶] Sure. [¶] He testified,
contraband, weapons, all of that sort of
thing are found in there, all the time, that
was his testimony. [¶] If he missed it, he
has to have a place to put it. [¶] And he put
it squarely on [defendant.] [¶] Your job
really is not an easy one, because, you have
to figure out where the truth is, figure out
all of these nuances. [¶] Figure out if
somebody can actually put a Saran Wrapped
knife that far up into their body cavity
without being injured. [¶] ... [¶] This is
not a delicate mechanism, it looks like a
piece of brass to me, certainly a piece of
metal, heavy metal, short point, no
protection. [¶] Doesn't make sense. [¶] The
thing that makes sense is that it was
missed."

Defendant now contends that the prosecutor improperly
vouched for Officer Quiram's credibility by suggesting,
in defendant's words, that the officer "would not put
such a good job at risk by lying." Accordingly,
defendant argues defense counsel was ineffective for
failing to object to the prosecutor's argument.

"A prosecutor is prohibited from vouching for the
credibility of witnesses or otherwise bolstering the
veracity of their testimony by referring to evidence
outside the record. [Citations.] Nor is a prosecutor
permitted to place the prestige of her office behind a
witness by offering the impression that she has taken
steps to assure a witness's truthfulness at trial.
[Citation.] However, so long as a prosecutor's
assurances regarding the apparent honesty or
reliability of prosecution witnesses are based on the
'facts of [the] record and the inferences reasonably
drawn therefrom, rather than any purported personal
knowledge or belief,' her comments cannot be
characterized as improper vouching. [Citations.]"

28

*(People v. Frye* (1998) 18 Cal.4th 894, 971.)

> The prosecutor did not vouch for the truthfulness or
> accuracy of the officer's testimony when he essentially
> argued that in order to accept the defense theory, the
> jury would have to believe that the officer would lie
> about his observations of defendant and thereby risk
> his fledging (sic) career as a correctional officer.
> *(People v. Anderson* (1990) 52 Cal.3d 453, 479 [no
> improper prosecutorial vouching because the prosecutor
> limited her remarks to facts of record, namely, the
> years of experience of the officers involved, and the
> prosecutor's "vouching" was clearly based on inferences
> reasonably drawn therefrom, rather than on the
> prosecutor's personal belief or knowledge].) Here, the
> prosecutor argument was loosely based on facts in
> evidence-the officer's three-year employment with the
> Department of Corrections which began with a 16-week
> training academy. The prosecutor also appealed to the
> jurors' common perceptions about civil service
> employment and did not imply he had any personal
> knowledge or belief about Officer's Quiram that would
> support the officer's veracity as a witness.
>
> In any event, even if there was misconduct it was
> slight and not prejudicial. (See *People v. Padilla*
> (1995) 11 Cal.4th 891, 946 [prosecutor said in his
> closing argument that, had the officer lied, he would
> have risked his whole career of 17 years; court held
> that although the argument was probably improper, there
> was no reasonable probability the defendant was
> prejudiced]*; U.S. v. Martinez* (6th Cir.1992) 981 F.2d
> 867, 871 [prosecutor asked the jury why a detective
> would risk his 18-year police career by lying on the
> stand; court held the prosecutor's comment was simply
> an isolated misstatement which did not likely prejudice
> the defendant because any possible prejudice was
> ameliorated by the trial court's instruction to the
> jury that the lawyers' arguments are not evidence].)
>
> As we have already determined that the prosecutor
> committed no error, or any error did not result in
> prejudice, there can be no ineffective assistance due
> to defense counsel's failures to object. (*People v.
> Cunningham* (2001) 25 Cal.4th 926, 1038.)

(LD 1, 6-12.)

### B.   Misstating the Burden of Proof

Petitioner argues that the prosecutor misstated and thereby lowered the government's burden of proof beyond a reasonable doubt.  Petitioner points to 1) the prosecutor's statement

1    concerning the "state of the case" in which he used a double

2    negative; 2) his repeated references to the use of the standard

3    in every criminal case; 3) his statements minimizing the standard

4    as provable and not insurmountable; and 4) what Petitioner

5    describes as equating the standard with common sense.

6        A prosecutor's improper remarks violate the Constitution

7    only if they so infect the trial with unfairness as to make the

8    resulting conviction a denial of due process.  Parker v.

9    Matthews, – U.S. -, 132 S.Ct. 2148, 2153 (2012) (per curiam);

10   see, Darden v. Wainwright, 477 U.S. 168, 181 (1986); Comer v.

11   Schriro, 480 F.3d 960, 988 (9th Cir. 2007).  Prosecutorial

12   misconduct deprives the defendant of a fair trial as guaranteed

13   by the Due Process Clause if it prejudicially affects the

14   substantial rights of a defendant.  United States v. Yarbrough,

15   852 F.2d 1522, 1539 (9th Cir. 1988) (citing Smith v. Phillips,

16   455 U.S. 209, 219 (1982)).  However, the standard of review of

17   claims concerning prosecutorial misconduct in proceedings

18   pursuant to § 2254 is the narrow standard of due process, and not

19   the broad exercise of supervisory power; improper argument does

20   not, per se, violate a defendant's constitutional rights.

21   Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (citing

22   Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996)).

23       Here, many of the prosecutor's remarks constituted

24   reasonable argument concerning how the jury should view the

25   evidence and proceed to determine whether the reasonable doubt

26   standard had been met.  The state court reasonably concluded that

27   the prosecutor did not equate the standard with common sense or

28   everyday decision making, but rather asked the jury to use its

30

1 common sense.  Further, in describing the use of the standard,

2 the prosecutor did not contradict or dilute the standard.

3 Describing the requirement as not insurmountable, not impossible,

4 provable, and a higher level of proof was not incorrect.

5      The prosecutor's remark concerning the state of the case was

6 arguably a misstatement of the reasonable doubt standard because

7 a double negative was used.  Further, if his statement about its

8 having to be above maybe or probable is interpreted as a

9 statement about the nature of the doubt itself, the statement was

10 also arguably incorrect.  However, the precise meaning of the

11 remarks was unclear.  Courts have recognized that the arguments

12 of advocates are somewhat improvisational and must not be unduly

13 restrained.  "Counsel are given latitude in the presentation of

14 closing arguments, and courts must allow the prosecution to

15 strike hard blows based on the evidence presented and all

16 reasonable inferences therefrom."  Ceja v. Stewart, 97 F.3d 1246,

17 1253-54 (9th Cir. 1996) (quoting United States v. Baker, 10 F.3d

18 1374, 1415 (9th Cir. 1993)).  A reviewing court should consider

19 challenged remarks in light of the realistic nature of closing

20 arguments at trial.  "Because 'improvisation frequently results

21 in syntax left imperfect and meaning less than crystal clear,' 'a

22 court should not lightly infer that a prosecutor intends an

23 ambiguous remark to have its most damaging meaning or that a

24 jury, sitting through lengthy exhortation, will draw that meaning

25 from the plethora of less damaging interpretations.'"  Williams

26 v. Borg, 139 F.3d 737, 744 (9th Cir. 1998) (quoting Donnelly v.

27 DeChristoforo, 416 U.S. 637, 647 (1974)).

28 ///

In determining whether remarks rendered a trial
fundamentally unfair, a court must judge the remarks in the
context of the entire proceeding to determine whether the
argument influenced the jury's decision.  Boyde v. California,
494 U.S. 370, 385 (1990); Darden v. Wainwright, 477 U.S. at 179-
82.  In Darden, the Court considered whether the prosecutor
manipulated or misstated evidence, whether specific rights of the
accused were implicated, the context of the remarks in light of
both parties' arguments, the instructions given by the trial
court, and the weight of the evidence.  Darden, 477 U.S. at 179-
82.

Here, the problematic remarks were isolated and did not
misstate the evidence.  They were made in a context of other,
reasonable argument, and they were neutralized by the Court's
instructions.[4]  Further, even the prosecutor himself referred the

---

[4] A review of the transcript shows that the trial court instructed the
jury that the facts must be determined from the evidence and not from any
other source (2 RT 195); the jury must accept and follow the law as the court
stated it, and if anything concerning the law that was said by the attorneys
in their arguments or at any other time conflicted with the court's
instructions, the jury must follow the instructions (id.); the jury was to be
governed only by the instructions in their final wording (id. at 196); the
jury was to consider the instructions as a whole and in light of all the
others (id. at 197); and statements made by attorneys during the trial were
not evidence (id.).  Further, the jury was also informed of the presumption of
innocence and the placement of the burden of proof on the government. (Id. at
205.)  Reasonable doubt was defined as follows:

    It is not a mere possible doubt, because everything
    related to human affairs is open to some possible or
    imaginary doubt.

    It is that state of the case which, after the entire
    comparison and consideration of all of the evidence,
    leaves the minds of the jurors in that condition that
    they cannot say they feel an abiding conviction of the
    truth of the charge.
(Id.)

    Defense counsel argued the need to prove the case beyond a reasonable
doubt and that the burden of proof was not a minimal thing.  He distinguished
it as being higher than the civil standard of more probable than not, and he
noted that it was the highest standard that Americans recognize with respect

jury to the reasonable doubt instruction.  Isolated passages of a prosecutor's argument may not have a significant impact on the jury's deliberations where the jury is informed in advance that they are matters of opinion and not evidence.  Donnelly v. DeChristoforo, 416 U.S. at 646.  Instructing the jury that lawyers' comments and argument are not evidence can cure the harmful effect of isolated instances of improper argument, Sassounian v. Roe, 230 F.3d 1097, 1107 (9th Cir. 2000); arguments of counsel carry less weight with a jury than do instructions from the court, Boyde v. California, 494 U.S. at 384-85.

The state court thus reasonably concluded that a rational juror would not have been misled or confused, and that the Petitioner was not prejudiced by any failure of defense counsel to object.  The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law.

C.   Vouching

Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony.  United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993).  Vouching for the credibility of a witness or expressing a personal opinion concerning the accused's guilt can pose two dangers.  First, it can convey the impression that evidence known by the prosecutor but not presented to the jury supports the charges, and thus it

---

to proof, requiring very persuasive evidence.  (Id. at 224-25.)  He argued that the absence of a videotaped record, fingerprints, and DNA evidence prevented the prosecution from meeting its high burden of proof.  (Id. at 232-33.)

1   can jeopardize the defendant's right to be tried solely on the

2   basis of the evidence presented to the jury.  United States v.

3   Young, 470 U.S. 1, 18 (1985).  Second, the prosecutor's opinion

4   reflects the imprimatur of the government and may induce the jury

5   to trust the government's judgment rather than its own assessment

6   of the evidence.  Id. at 18-19.

7       When a prosecutor engages in argument that violates the

8   ethical principle that a lawyer not express a personal belief or

9   opinion in the truth or falsity of any testimony or evidence, the

10  violation must be viewed in context to determine whether the

11  prosecutor's conduct affected the fairness of the trial.  United

12  States v. Young, 470 U.S. at 10-11.  To determine whether

13  prejudicial error occurred, a court must consider the probable

14  effect of the prosecutor's argument on the jury's ability to

15  judge the evidence fairly.  Id. at 12.  Vouching for a witness's

16  credibility is more likely to be damaging where the credibility

17  of the witness is crucial.  United States v. Edwards, 154 F.3d

18  915, 921 (9th Cir. 1998).  The standard of Darden v. Wainwright

19  is a very general one that leaves courts with more leeway in

20  reaching outcomes in case-by-case determinations.  Parker v.

21  Matthews, 132 S.Ct. at 2155 (quoting Yarborough v. Alvarado, 541

22  U.S. 652, 664 (2004)).

23      Furthermore, prosecutors may argue reasonable inferences

24  based on the evidence, including that one of the two sides is

25  lying.  United States v. Necoechea, 986 F.2d at 1276.  Here, the

26  prosecutor's remarks concerning Officer Quiram's working for the

27  state and lack of motivation to lie were isolated, and the state

28  court reasonably concluded that the argument was based on record

34

1  facts and inferences reasonably drawn therefrom, as distinct from

2  any personal knowledge or belief of the prosecutor.  Defense

3  counsel was permitted to argue that contrary to the prosecutor's

4  argument, the officer's job provided a motivation to lie.[5]

5      The Court concludes that the state court's decision was not

6  contrary to, or an unreasonable application of, clearly

7  established federal law concerning a due process claim of

8  prosecutorial misconduct.  The state court's rejection of the

9  prosecutorial misconduct claim was not "so lacking in

10 justification that there was an error well understood and

11 comprehended in existing law beyond any possibility for

12 fairminded disagreement."  Parker v. Matthews, 132 S.Ct at 2155

13 (quoting Harrington v. Richter, 131 S.Ct. at 767-87).

14     Considering all the conduct argued to be prosecutorial

15 misconduct in light of the totality of the circumstances, the

16 Court concludes that the state court's decision finding no

17 fundamental unfairness or denial of due process was not contrary

18

19     [5] The prosecutor argued that the correctional officer had no reason to
20 lie because he would retain his job and lifestyle regardless of the jury's
   ultimate verdict; further, to lie would jeopardize his excellent job with the
   state because it would risk or compromise his credibility.  (2 RT 222.)
21     In response, defense counsel argued that if one were the officer
   responsible for a sweep of the holding cell and logged the sweep, and further
   if a knife were found in one of the cells, someone "has got to be blamed."
22 (Id. at 228.)  The trial court overruled the prosecutor's objection to this
   line of argument because the prosecutor had raised it in argument, and the
23 defense was entitled to respond to it.  (Id.)  Defense counsel suggested that
   the officer could have stood close to the metal detector to obtain a false
24 alert in an effort to protect his job.  (Id. at 229.)
       In his final closing, the prosecutor argued that the lack of privacy in
25 prison resulted in inmates' carrying weapons in unusual places.  In light of
   the continuing problem of weapons in prison, as reflected in the news, the
26 exercise of common sense made it possible and sensible to believe that an
   inmate would conceal a knife in his rectum.  (Id. at 235.)  The prosecutor
27 characterized the defense's argument that the officer was lying as
   speculation, and made statements concerning reasonable doubt, hypotheticals,
   and probability that are objected to by Petitioner in this proceeding.  (Id.
28 at 236-37.)  The prosecutor then argued that it made sense that the activation
   of the metal detector was followed by discovery of a weapon from the
   Petitioner's rectum.  (Id. at 238.)

1   to, or an unreasonable application of, clearly established
2   federal law.  Accordingly, Petitioner's prosecutorial misconduct
3   claim will be denied.

4        IX.   Ineffective Assistance of Counsel

5        As the foregoing analysis shows, Petitioner's due process
6   claims based on prosecutorial misconduct were not meritorious.
7   If counsel had objected to all the challenged statements, some of
8   the objections would have been overruled.  To the extent that any
9   of the prosecutor's remarks were technically misconduct, an
10  admonition or repetition of the pertinent instructions would have
11  cured any harm.  The evidence against Petitioner was strong.
12  When viewed in context, even in the absence of objection and
13  admonition, the remarks were not such as would have rendered a
14  more favorable result reasonably probable or resulted in
15  unfairness to Petitioner.

16       The Court concludes that the state court's decision denying
17  Petitioner's Sixth and Fourteenth Amendment claim of ineffective
18  assistance of counsel relating to prosecutorial misconduct was
19  not contrary to, or an unreasonable application of, clearly
20  established federal law.  Accordingly, Petitioner's claim of
21  ineffective assistance of counsel relating to prosecutorial
22  misconduct will be denied.

23       X.   Cumulative Error

24       Petitioner argues that the cumulative impact of all the
25  errors deprived him of a fair trial.

26            A.   The State Court Decision

27       The pertinent portion of the CCA's decision was as follows:

28       III. Cumulative Error

36

1    Defendant contends that the cumulative impact of all of
     the claimed errors deprived him of a fair trial. We
2    have either rejected defendant's claims of error and/or
     found any errors to not be prejudicial on an individual
3    basis. Viewing the errors as a whole, we find that the
     errors do not warrant reversal of the judgment. (*People*
4    *v. Stitely* (2005) 35 Cal.4th 514, 560.)

5    (LD 1, 12.)

6         B.  <u>Analysis</u>

7         The Supreme Court has clearly established that the combined

8    effect of multiple trial court errors violates due process where

9    it renders the resulting criminal trial fundamentally unfair,

10   even though no single error rises to the level of a

11   constitutional violation or would independently warrant reversal.

12   <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007) (citing

13   <u>Chambers v. Mississippi</u>, 410 U.S. 284, 298, 302-03 (1973)).

14   Traditional principles of due process provide that cumulative

15   errors warrant habeas relief only where the errors have so

16   infected the trial with unfairness that the resulting conviction

17   denies due process, such as where the combined effect of the

18   errors had a substantial and injurious effect or influence on the

19   jury's verdict, <u>id.</u> (citing <u>Donnelly v. DeChristoforo</u>, 416 U.S.

20   at 643 and <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)), and

21   where the combined effect of individually harmless errors renders

22   a criminal defense far less persuasive than it might otherwise

23   have been, <u>id.</u> (citing <u>Chambers</u>, 410 U.S. at 294, 302-03).

24        In evaluating a due process challenge based on the

25   cumulative effect of multiple trial errors, a reviewing court

26   must determine the relative harm caused by the errors.  If the

27   evidence of guilt is otherwise overwhelming, the errors are

28   considered "harmless," and the conviction will generally be

                                37

1 | affirmed.   <u>Parle v. Runnels</u>, 505 F.3d at 927-28.  The overall
2 | strength of the prosecution's case must be considered because
3 | where the government's case on a critical element is weak, or
4 | where the verdict or conclusion is only weakly supported by the
5 | record, it is more likely that trial errors will be prejudicial
6 | to the defendant.  <u>Id.</u> at 928.

7 | Here, the evidence against Petitioner was very strong.
8 | Officer Quiram's testimony established the pertinent search
9 | procedures, and the officer had personally conducted the search
10 | of the holding cell in which the knife was found to have been
11 | inside Petitioner.  Quiram's testimony established that the LED
12 | indicator on the metal detector indicated something in the
13 | approximate area where it was found to have been secreted, and
14 | Petitioner himself removed the object from his rectum.  To the
15 | extent that any error occurred at all, it was not prejudicial.

16 | The state court's decision that cumulative error did not
17 | deprive Petitioner of a fundamentally fair trial was not contrary
18 | to, or an unreasonable application of, any clearly established
19 | federal law.  Accordingly, Petitioner's cumulative error claim
20 | will be denied.

21 | XI.  <u>Request for an Evidentiary Hearing</u>

22 | Petitioner requests an evidentiary hearing with respect to
23 | "all matters in question."  (Doc. 34, 47.)

24 | The decision to grant an evidentiary hearing is generally a
25 | matter left to the sound discretion of the district courts.  28
26 | U.S.C. § 2254; Habeas Rule 8(a); <u>Schriro v. Landrigan</u>, 550 U.S.
27 | 465, 473 (2007).  To obtain an evidentiary hearing in federal
28 | court under the AEDPA, a petitioner must allege a colorable claim

by alleging disputed facts which, if proved, would entitle him to

relief.  Schriro v. Landrigan, 550 U.S. at 474.

    The determination of entitlement to relief is, in turn, is

limited by 28 U.S.C. § 2254(d)(1), which requires that to obtain

relief with respect to a claim adjudicated on the merits in state

court, the adjudication must result in a decision that was either

contrary to, or an unreasonable application of, clearly

established federal law.  Schriro v. Landrigan, 550 U.S. at 474.

Further, in analyzing a claim pursuant to § 2254(d)(1), a federal

court is limited to the record that was before the state court

that adjudicated the claim on the merits.  Cullen v. Pinholster,

131 S.Ct. 1388, 1398 (2011).

    Thus, when a state court record precludes habeas relief

under the limitations set forth in § 2254(d), a district court is

not required to hold an evidentiary hearing.  Cullen v.

Pinholster, 131 S.Ct. 1388, 1399 (2011) (citing Schriro v.

Landrigan, 550 U.S. 465, 474 (2007)).

    As the foregoing analysis shows, the Court has concluded

that habeas corpus relief is precluded under the limitations set

forth in § 2254(d)(1).  Accordingly, an evidentiary hearing is

not required, and Petitioner's request will be denied.

    XII.  Certificate of Appealability

    Unless a circuit justice or judge issues a certificate of

appealability, an appeal may not be taken to the Court of Appeals

from the final order in a habeas proceeding in which the

detention complained of arises out of process issued by a state

court.  28 U.S.C. § 2253(c)(1)(A); Miller-El v. Cockrell, 537

U.S. 322, 336 (2003).  A certificate of appealability may issue

only if the applicant makes a substantial showing of the denial
of a constitutional right.  § 2253(c)(2).  Under this standard, a
petitioner must show that reasonable jurists could debate whether
the petition should have been resolved in a different manner or
that the issues presented were adequate to deserve encouragement
to proceed further.  Miller-El v. Cockrell, 537 U.S. at 336
(quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  A
certificate should issue if the Petitioner shows that jurists of
reason would find it debatable whether the petition states a
valid claim of the denial of a constitutional right and that
jurists of reason would find it debatable whether the district
court was correct in any procedural ruling.  Slack v. McDaniel,
529 U.S. 473, 483-84 (2000).

     In determining this issue, a court conducts an overview of
the claims in the habeas petition, generally assesses their
merits, and determines whether the resolution was debatable among
jurists of reason or wrong.  Id.  It is necessary for an
applicant to show more than an absence of frivolity or the
existence of mere good faith; however, it is not necessary for an
applicant to show that the appeal will succeed.  Miller-El v.
Cockrell, 537 U.S. at 338.

     A district court must issue or deny a certificate of
appealability when it enters a final order adverse to the
applicant.  Rule 11(a) of the Rules Governing Section 2254 Cases.

     Here, it does not appear that reasonable jurists could
debate whether the petition should have been resolved in a
different manner.  Petitioner has not made a substantial showing
of the denial of a constitutional right.

1    Accordingly, the Court will decline to issue a certificate
2  of appealability.

3    XIII.  <u>Disposition</u>

4    Petitioner raised additional claims in the second amended
5  petition, but those claims were previously dismissed pursuant to
6  Respondent's motion to dismiss.

7    Therefore, in accordance with the foregoing analysis, it is
8  ORDERED that:

9    1) Daniel Paramo, Acting Warden, is SUBSTITUTED as
10 Respondent; and

11   2)  The second amended petition for writ of habeas corpus is
12 DENIED; and

13   3)  Petitioner's request for an evidentiary hearing is
14 DENIED; and

15   4)  The Clerk is DIRECTED to enter judgment for Respondent;
16 and

17   5)  The Court DECLINES to issue a certificate of
18 appealability.

19

20

21 IT IS SO ORDERED.

22 **Dated:   July 26, 2012**            /s/ Sheila K. Oberto
                                     UNITED STATES MAGISTRATE JUDGE
23

24

25

26

27

28

41