UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAMES CONRIQUEZ, JR., Petitioner, v. DANIEL PARAMO, Acting Warden, Respondent.

1:09-cv—01003-SKO-HC

ORDER SUBSTITUTING ACTING WARDEN DANIEL PARAMO AS RESPONDENT (DOC. 47)

ORDER DENYING THE SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS (DOC. 34)

ORDER DENYING PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING (DOC. 34)

ORDER DIRECTING THE ENTRY OF JUDGMENT FOR RESPONDENT AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge to conduct all further proceedings in the case, including the entry of final judgment, by manifesting their consent in writings signed by the parties or their representatives and filed by Petitioner on August 24, 2009, and on behalf of Respondent on August 18, 2009.

Pending before the Court is the second amended petition (SAP), which was filed on July 21, 2011.

I. Jurisdiction

Because the petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies in this proceeding. Lindh v. Murphy, 521 U.S. 320, 327 (1997), cert. denied, 522 U.S. 1008 (1997); Furman v. Wood, 190 F.3d 1002, 1004 (9th Cir. 1999).

A district court may entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court only on the ground that the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. §§ 2254(a), 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000); Wilson v. Corcoran, 562 U.S. –, –, 131 S.Ct. 13, 16 (2010) (per curiam). Petitioner claims that in the course of the proceedings resulting in his conviction, he suffered violations of his Constitutional rights. Further, the challenged judgment was rendered by the Superior Court of the State of California for the County of Kern (KCSC), which is located within the territorial jurisdiction of this Court. 28 U.S.C. §§ 84(b), 2254(a), 2241(a), (d).

At the time the initial petition was filed, Petitioner was incarcerated at the Corcoran State Prison, which is located within the territorial jurisdiction of this Court. (Doc. 1, 1.) n.6). Petitioner named the warden of that institution as Respondent. Although Petitioner was subsequently transferred to another prison, the Court maintains its jurisdiction because "jurisdiction attaches on the initial filing for habeas corpus

relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change." Francis v. Rison, 894 F.2d 353, 354 (9th Cir. 1990) (citing Smith v. Campbell, 450 F.2d 829, 834 (9th Cir. 1971)).

The Court thus concludes that it has jurisdiction over the subject matter of the action and over the person of the Respondent.

II. Substitution of Respondent

Title 28 U.S.C. § 2242 provides that a petition for writ of habeas corpus shall allege the name of the person who has custody over the applicant. Rule 2(a) of the Rules Governing Section 2254 Cases in the District Courts (Habeas Rules) provides that if the petitioner is currently in custody under a state court judgment, the petition must name as respondent the state officer who has custody. A failure to name the proper respondent destroys personal jurisdiction. Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994). The warden of the penitentiary where a prisoner is confined constitutes the custodian who must be named in the petition, and the petition must be filed in the district of confinement. Johnson v. Reilly, 349 F.3d 1149, 1153 (9th Cir. 2003).

At the time the petition was filed, Petitioner was incarcerated at the Corcoran State Prison. (Doc. 1, 1.) In the answer, Respondent sought pursuant to Fed. R. Civ. P. 25(d) to substitute Ralph M. Diaz, the Acting Warden of the Petitioner's institution of confinement. (Doc. 44, 6 n.1.) However, petitioner was subsequently transferred to the R. J. Donovan State Prison (RJDSP) at San Diego, California. (Doc. 47.) The

Court notes that the official website of the California Department of Corrections and Rehabilitation (CDCR) reflects that the present acting warden of the RJDSP is Daniel Paramo.

Fed. R. Civ. P. 25(d) provides that when a public officer who is a party to a civil action in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party. The Court may order substitution at any time, but the absence of such an order does not affect the substitution. Id. Accordingly, it will be ordered that Acting Warden Daniel Paramo be substituted as Respondent.

III. Procedural Summary

On May 1, 2007, in KCSC case number SF013296A, Petitioner was convicted at a jury trial of being a prison inmate in possession of a weapon, to wit, a dirk, dagger, or sharp instrument, in violation of Cal. Pen. Code § 4502(a). (SAP 1; LD 1, 1-2.)[1] The trial court found true allegations that Petitioner had two prior convictions for the purpose of the Three Strikes Law. Petitioner was sentenced to twenty-five years to life to run consecutively to an eight-year term he was serving at the time of the instant offense. (LD 1, 1-2.)

Petitioner appealed his conviction, which was affirmed by the California Court of Appeal, Fifth Appellate District (CCA) in an opinion filed on March 18, 2008. (LD 1, 1.)

A petition for review filed in the California Supreme Court (CSC) was denied without a statement of reasoning or authority on

[1] "LD" refers to documents lodged by the Respondent in support of the answer.

May 21, 2008. (LD 2, 1; LD 3.)

Petitioner filed a petition for writ of habeas corpus in the KCSC, which denied the petition in a decision setting forth a statement of reasons and citing authorities on October 26, 2009. (LD 4.)

Petitioner fled a petition for writ of habeas corpus in the CCA, which denied the petition on June 2, 2010, in a decision setting forth a statement of reasons and citing authorities. (LD 5.)

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court (CSC), which denied the petition summarily on February 16, 2011. (LD 6, LD 7.)

On May 19, 2009, Petitioner filed his initial petition, which was transferred to this Court on June 9, 2009. A first amended petition was filed, and the proceedings were stayed for the purpose of exhaustion of state court remedies as to some claims. Proceedings continued with the filing of Petitioner's second amended petition (SAP) on July 21, 2011 (doc. 34). Respondent's motion to dismiss Petitioner's fourth and fifth claims as untimely was granted on January 4, 2012. Respondent filed an answer and supporting documentation on February 21, 2012. Petitioner filed a traverse on March 19, 2012.

IV. Factual Summary

In a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness. 28

U.S.C. § 2254(e)(1); Sanders v. Lamarque, 357 F.3d 943, 947-48 (9th Cir. 2004). This presumption applies to a statement of facts drawn from a state appellate court's decision. Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009). The following statement of facts is taken from the decision of the CCA in People v. James Conriquez, Jr., case number F052850, filed on March 18, 2008.

FACTS

> In the early morning hours of May 15, 2006, Jeffrey Quiram, a correctional officer at the Wasco State Prison in Kern County, was assigned to the receiving and releasing unit of the prison. His work entailed preparing inmates to be transported by bus to different institutions. Defendant was scheduled to be transferred to the California Men's Colony in San Luis Obispo.
>
> Officer Quiram described the procedure for processing inmates who come to the receiving and releasing unit. First they are placed in different cells. They are then strip-searched to ensure they do not possess contraband. Next, they are given paper jumpsuits, boxers, and t-shirts to wear and are placed in a different holding cell. They are then pulled out one at a time, photographed for identification, and sent through a metal detector. Finally, they stand in line and wait for a transportation unit to chain them up to go on the bus.
>
> Officer Quiram first made contact with defendant around 3:00 a.m. Officer Quiram strip-searched defendant. He did not locate any contraband on defendant or observe anything near or around defendant's rectum. Defendant was then issued a paper jumpsuit and was placed in a holding cell.
>
> After Officer Quiram's partner photographed defendant, defendant was sent through the metal detector. When defendant went through the metal detector, it sounded and LED lights illuminated. The LED lights indicated there was something metal around defendant's "waist area."
>
> Officer Quiram instructed defendant to go back through the metal detector one more time. The metal detector sounded again and the LED lights illuminated, indicating the metal was in the same area. Officer Quiram escorted defendant back to a pre-searched holding cell. The cell was searched every night around

2:00 a.m. That night, Officer Quiram searched the cell himself and did not locate anything inside the cell. He also inspected it visually before putting defendant in the cell and did not observe anything.

As he was escorting defendant over to the holding cell, Officer Quiram asked defendant "if he had anything on him, and if he had something on him, to go ahead and give it up, before [the officer] could allow him to get on the bus." In response, defendant said he had something in his rectum or "butt, or some slang." After Officer Quiram placed him in the holding cell, he again asked defendant "if he had anything on him, that he needed to give it up, so that he could be sent out on the bus." Defendant said "he had a knife, or blade in his rectum, and [Officer Quiram] said he needed to get it out."

In response, defendant unzipped his jumpsuit, squatted down, and removed the object. Officer Quiram had defendant place the object on the ground in front of him, outside the bars. The object Officer Quiram retrieved was a piece of metal that looked like a blade and was wrapped in plastic. It appeared to have a handle on one end, which was fashioned out of tape and orange, plastic garbage-sack material. The other end of the object was "sharpened to a point." To Officer Quiram, it looked like a "stabbing type weapon."

(LD 1, 2-3.)

V. Standard of Decision and Scope of Review

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

///

Clearly established federal law refers to the holdings, as opposed to the dicta, of the decisions of the Supreme Court as of the time of the relevant state court decision. Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S. 362, 412 (2000). It is thus the governing legal principle or principles set forth by the Supreme Court at the pertinent time. Lockyer v. Andrade, 538 U.S. 71-72.

A state court's decision contravenes clearly established Supreme Court precedent if it reaches a legal conclusion opposite to, or substantially different from, the Supreme Court's or concludes differently on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. at 405-06. The state court need not have cited Supreme Court precedent or have been aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [it]." Early v. Packer, 537 U.S. 3, 8 (2002). A state court unreasonably applies clearly established federal law if it either 1) correctly identifies the governing rule but applies it to a new set of facts in an objectively unreasonable manner, or 2) extends or fails to extend a clearly established legal principle to a new context in an objectively unreasonable manner. Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002); see, Williams, 529 U.S. at 407. An application of clearly established federal law is unreasonable only if it is objectively unreasonable; an incorrect or inaccurate application is not necessarily unreasonable. Williams, 529 U.S. at 410.

///

A state court's determination that a claim lacks merit precludes federal habeas relief as long as fairminded jurists could disagree on the correctness of the state court's decision. Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011). Even a strong case for relief does not render the state court's conclusions unreasonable. Id. To obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87. The standards set by § 2254(d) are "highly deferential standard[s] for evaluating state-court rulings" which require that state-court decisions be given the benefit of the doubt, and the Petitioner bear the burden of proof. Cullen v. Pinholster, 131 S. Ct. at 1398. Further, habeas relief is not appropriate unless each ground supporting the state court decision is examined and found to be unreasonable under the AEDPA. Wetzel v. Lambert, --U.S.--, 132 S.Ct. 1195, 1199 (2012).

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S. Ct. at 1398. Evidence introduced in federal court has no bearing on review pursuant to § 2254(d)(1). Id. at 1400. As previously noted, 28 U.S.C. § 2254(e)(1) provides that in a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be

presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.

VI. Admissibility of Petitioner's Out-of-Court Statements

Petitioner argues that the statements he made to Officer Quiram were inadmissible because he was not advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).

A. Last Reasoned Decision

A state has adjudicated a claim on the merits within the meaning of § 2254(d) when it decides the petitioner's right to relief based on the substance of the constitutional claim raised, rather than denying the claim because of a procedural or other rule precluding state court review of the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).

Here, the CCA rendered a decision on the merits, and the CSC declined to review the CCA's decision. A state court's decision to deny discretionary review, such as a decision of the California Supreme Court to deny a petition for discretionary review of a state court of appeal's decision on direct appeal in a non-capital case, is not a decision on the merits, but rather is only a determination that the California Supreme Court will not consider the case on the merits. Williams v. Cavazos, 646 F.3d 626, 636 (9th Cir. 2011), cert. grtd. in part,[2] Cavazos v. Williams, --- S.Ct. ----, 2012 WL 104740 (No. 11-465, U.S. Jan 13, 2012) (citing Harrington v. Richter, – U.S. –, 131 S.Ct. 770, 784-85 (2011); Cal. R. Ct. 8.500; and Campter v. Workers' Comp.

[2] Certiorari was granted as to the limited issue of whether a habeas petitioner's claim has been "adjudicated on the merits" for purposes of 28 U.S.C. § 2254(d) where the state court denied relief in an explained decision but did not expressly acknowledge a federal-law basis for the claim. Id.

Appeals Bd., 3 Cal.4th 679 (1992)). There is a rebuttable presumption that where there is one reasoned state judgment rejecting a federal claim, a later unexplained order upholding the judgment or rejecting the same claim rests upon the same ground. Ylst v. Nunnemaker, 501 U.S. 797, 801-02 (1991). Thus, this Court will "look through" the state supreme court's denial of discretionary review to the DCA decision, which was the last reasoned state court decision concerning the Miranda issue. Id. at 803-04; Williams v. Cavazos, 646 F.3d at 636; Taylor v. Maddox, 366 F.3d 992, 998 n.5 (9th Cir. 2004).

B. The State Court Decision

The decision of the CCA concerning Petitioner's Miranda claim was as follows:

> I. Claimed Miranda Violation
>
> Defendant contends his statements to Officer Quiram should not have been admitted at trial because they were obtained in violation of *Miranda, supra,* 384 U.S. 436. Recognizing this claim was waived by defense counsel's failure to object, defendant also contends he received ineffective assistance of counsel. FN2 We reject both claims based on our conclusion that, on the record before us, defendant was not in custody when questioned by Officer Quiram. Any restriction of movement he suffered when questioned by Officer Quiram was based upon the fact that the crime was committed at the Wasco State Prison. Accordingly, Officer Quiram was not required to administer Miranda warnings and defense counsel was not ineffective for failing to object to the admission of defendant's statements to the officer.
>
> > FN2. "To prevail on a claim of ineffective assistance of counsel, the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted. [Citations.] When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.] Even where deficient performance appears, the conviction must be

> upheld unless the defendant demonstrates prejudice, i.e., that, ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citations.]" *(People v. Anderson* (2001) 25 Cal.4th 543, 569; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Pope* (1979) 23 Cal.3d 412, 426.)

The United States Supreme Court held in *Mathis v. United States* (1968) 391 U.S. 1, 4-5 *(Mathis)* that a prison inmate incarcerated for an offense different from the one being investigated is entitled to *Miranda* warnings. As stated in *People v. Fradiue* (2000) 80 Cal.App.4th 15 *(Fradiue)*, however, even though the *Mathis* holding clearly granted the protections of *Miranda* to prison inmates, several lower federal courts have delineated an exception to this general rule "where the interrogation is conducted under circumstances where no restraint is placed upon the inmate over and above that associated with his prisoner status." (*Fradiue, supra*, 80 Cal.App.4th at p. 19, italics added.) *Fradiue* cited in particular *Cervantes v. Walker* (9th Cir.1978) 589 F.2d 424 (*Cervantes*) for the propositions that the usual test of whether a reasonable person would have felt free to leave was not useful in the inmate context and that Miranda warnings were not required in all investigatory prison interrogations. (*Fradiue, supra*, 80 Cal.App.4th at pp. 19-20.)

*Cervantes* analogized the investigatory questioning of an inmate to the type of on-the-scene questioning that occurs when police attempt to determine whether a crime has been committed and which does not require Miranda warnings. (*Cervantes, supra*, 589 F.2d at p. 427, citing *Miranda, supra*, 384 U.S. at pp. 477-478.) *Cervantes* stated that any other view would result in the illogical position of affording greater protection to prisoners than to persons not incarcerated. (*Cervantes, supra*, 589 F.2d at p. 427.) In order to *reconcile Mathis* with the principles of *Miranda, Cervantes* named four factors to consider in determining whether some extra degree of restraint was placed upon an inmate to force him to respond to police questioning: (1) the language used to summon the inmate for questioning; (2) the physical surroundings of the interrogation; (3) the extent to which the inmate is confronted with evidence of his guilt; and (4) the additional pressure exerted to detain him. (*Cervantes, supra*, 589 F.2d at p. 428.)

In the instant case, defendant was not summoned for questioning but was stopped from advancing to the bus

for a prison transfer after he twice set off the metal detector. The location of the brief questioning was somewhere between the metal detector and the holding cell to which defendant was escorted and then the questioning was repeated once defendant was inside the cell; an environment not out of the ordinary for an inmate such as defendant. The extent to which defendant was confronted with evidence of his guilt was not extensive. Officer Quiram merely asked defendant if he had anything on him and stated, matter-of-factly, that if defendant did have something, he would have to give it up before he could be allowed on the bus. Finally, there was no additional pressure exerted on defendant over and above his already existent confinement to prison. The evidence indicates that the manner in which defendant was escorted to a holding cell was in accordance with normal prison procedures.

The record thus shows that defendant was questioned in the context of an on-the-scene investigation, and there is no evidence his movements were curtailed to any degree over and above that associated with his status as an inmate of the Wasco State Prison. We therefore conclude that, under the facts of this case, defendant was not in custody when he spoke with Officer Quiram and the officer was not required to administer Miranda warnings before he questioned defendant. Accordingly, defendant's related claim that defense counsel rendered ineffective assistance by failing to object must be rejected; counsel undoubtedly realized an objection would have been unavailing. FN3

FN3. As defendant notes, in response to the People's in limine motion to admit defendant's statements and resolve any Miranda issues, defense counsel indicated he did not think there was a Miranda issue because defendant's statement "would be an admission prior to any real investigation into it" and agreed with the court's statement "[s]o it's not a statement made during a custodial detention where there was an interrogation, so far as you can tell...." In light of the above authorities, defense counsel's assessment of the issue was not unreasonable and his failure to object on Miranda grounds did not demonstrate professional incompetence.

(LD 1, 3-6.)

C. <u>Analysis</u>

Under §2254(d)(1), "clearly established Federal law, as determined by the Supreme Court of the United States" includes

only the Supreme Court's decisions as of the time of the relevant state court adjudication on the merits. Cullen v. Pinholster, 563 U.S. - , 131 S.Ct. at 1399. A review of the key decisions existing at the time of the pertinent state court decisions in Petitioner's case shows that it was not clearly established by decisions of the Supreme Court that incarceration necessarily amounts to custody in violation of Miranda v. Arizona, 384 U.S. 436 (1966).

In Mathis v. United States, 391 U.S. 1 (1968), Miranda was held applicable to federal agents' interrogation of a state prisoner concerning fraudulent tax refund claims where the prisoner was incarcerated on state charges. The Court concluded that the fact that the reason for the custody was distinct from the purpose of the investigation did not render Miranda inapplicable. Id. at 4-5.

However, in Illinois v. Perkins, 496 U.S. 292 (1990), the Court held that the coercive atmosphere against which the Miranda protocol was designed to protect was not present when an undercover informant questioned a prisoner in state prison. The Court reasoned that the essential elements of a police-dominated atmosphere, privacy permitting incommunicado interrogation, and compulsion were not present where an inmate spoke freely with one believed to be a fellow inmate. Id. at 295-96. The Court emphasized that Miranda need be strictly enforced only in those situations in which concerns related to inherently compelling pressures were implicated. Id. at 296. In a conversation with one believed to be a fellow inmate, there was no basis for fear of reprisal for remaining silent or hope for more lenient

treatment. Id. at 296-97. The Court expressly rejected the argument that Miranda warnings were required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent; it noted that the bare fact of custody might not in every instance require warnings even when a suspect is aware that he is speaking to an official. Id. at 299-300.

Decisions rendered after Petitioner's conviction reflect that the Supreme Court's view has been, and continues to be, that incarceration alone, or technical custody, is not sufficient to constitute an inherently coercive environment requiring Miranda advisements. In Maryland v. Shatzer, 130 S.Ct. 1213 (2010), the Court considered the rule of Edwards v. Arizona, 451 U.S. 477 (1981), a judicially prescribed prophylaxis to prevent an increased risk of coercion that would result from persistent attempts by law enforcement to interrogate a suspect in combination with prolonged police custody. Pursuant to the Edwards rule, a suspect who has invoked his right to the presence of counsel during custodial interrogation is not subject to further interrogation until either counsel has been made available or the suspect himself initiates further exchanges with the police. The Court determined that an inmate's release into the general prison population for over two weeks after he had invoked his right to counsel constituted a break in Miranda custody that warranted admission of inculpatory statements made by the inmate during renewed interrogation while he remained in custody and after he waived his Miranda rights. Id. at 1215-1216. The Court reasoned that the break undercut the conclusive

presumption of the Edwards rule that a waiver of rights in response to a subsequent police attempt at custodial interrogation was involuntary; it was of sufficient duration to dissipate the coercive effects of the initial Miranda custody. Id. at 1222-23.

Regarding the fact that the inmate was incarcerated throughout the multiple interrogations, the Court distinguished Miranda or "interrogative" custody from incarceration pursuant to a conviction. Id. at 1225 n.8. It noted that the elements of isolation, unfamiliarity of surroundings, police domination, and prolongation of custody are absent from the circumstances of a prisoner's remaining in the general population of a prison. Id. at 1220-21, 1224-25. The Court expressly noted that it had never decided whether incarceration constituted custody for Miranda purposes, and that it had explicitly declined to address the issue in previous cases. Id. at 1224. The Court reiterated that whether incarceration constitutes Miranda custody depends upon whether it exerts the danger of coercion that results form the interaction of custody and official interrogation. Id. Although all forms of incarceration constitute a restraint on freedom of movement associated with a formal arrest, this is "only a necessary and not a sufficient condition for Miranda custody." Id.[3]

---

[3] The Court stated in pertinent part:

> Here, we are addressing the interim period during which a suspect was not interrogated, but was subject to a baseline set of restraints imposed pursuant to a prior conviction. Without minimizing the harsh realities of incarceration, we think lawful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in *Miranda*.
>
> Interrogated suspects who have previously been convicted of crime

In Howes v. Fields, 132 S.Ct. 1181 (2012), the Court held that an inmate was not taken into custody for purposes of Miranda when he was escorted by armed officers from his cell and interviewed in an average-sized, well-lit conference room for five to seven hours and past his bedtime within the prison by sheriff's deputies about criminal conduct committed outside the prison, where he was not physically restrained, threatened, advised of his Miranda rights, or advised that he was free to decline to speak but was told that he could return to his cell whenever he wanted and was offered food and water. Id. at 1185-86. The Court rejected the argument that it had clearly established in Mathis v. United States or its other precedents that Miranda warnings must be administered when law enforcement officers remove an inmate from the general prison population and interrogate him regarding criminal conduct that took place outside the jail or prison. Id. at 1187. The Court reiterated its holding in Mathis that a prisoner who otherwise meets the

---

> live in prison. When they are released back into the general prison population, they return to their accustomed surroundings and daily routine—they regain the degree of control they had over their lives prior to the interrogation. Sentenced prisoners, in contrast to the *Miranda* paradigm, are not isolated with their accusers. They live among other inmates, guards, and workers, and often can receive visitors and communicate with people on the outside by mail or telephone.
>
> Their detention, moreover, is relatively disconnected from their prior unwillingness to cooperate in an investigation. The former interrogator has no power to increase the duration of incarceration, which was determined at sentencing. (Footnote omitted.) And even where the possibility of parole exists, the former interrogator has no apparent power to decrease the time served. This is in stark contrast to the circumstances faced by the defendants in *Edwards, Roberson, and Minnick*, whose continued detention as suspects rested with those controlling their interrogation, and who confronted the uncertainties of what final charges they would face, whether they would be convicted, and what sentence they would receive.

130 S.Ct. at 1225.

requirements for Miranda custody is not taken outside the scope of Miranda by either the fact that a criminal investigation had not yet been commenced at the time of the interview or that the prisoner was incarcerated for an unconnected offense. Id. at 1188. The Court expressly stated that neither Miranda nor Mathis held that imprisonment, in and of itself, is sufficient to constitute Miranda custody. Id. The Court characterized its holdings, including Illinois v. Perkins, as having "repeatedly declined to adopt any categorical rules with respect to whether the questioning of a prison inmate is custodial." Id. The Court reiterated that the freedom-of-movement test was only a necessary and not a sufficient condition for Miranda custody. Id. at 1190. The Court restated its test concerning Miranda custody as first, a determination of whether in light of all the objective circumstances surrounding the interrogation, a reasonable person would have felt that or she was not at liberty to terminate the interrogation and leave, followed by a determination of whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda. Id. at 1189-90.

The Court concludes that contrary to Petitioner's argument, at the time of the pertinent state court decision, it was not clearly established federal law within the meaning of § 2254(d)(1) that Petitioner's statements made during questioning within the prison were necessarily obtained in violation of Miranda v. Arizona.

Here, the state court acknowledged the holding of Mathis and other federal cases that considered the nature and quality of the

restraints upon a prison inmate who is being interrogated. The state court considered the relevant circumstances, including the fact that the impetus for questioning arose during a prison transfer, and thus the guard's questioning was analogous to on-the-scene questioning concerning whether a crime had been committed. The questioning was brief and occurred in an ordinary environment for a prison inmate. It was reasonable for the state court to conclude that there was no extensive confrontation of the inmate; only the routine scan by the metal detector indicated the likelihood that Petitioner carried contraband. The state court noted that the procedure used to escort Petitioner to a holding cell appeared to be the regular prison procedure, and the focus was not Petitioner's misconduct, but rather preparing Petitioner to travel to another institution in a manner that was consistent with the safety of all the inmates. The state court considered the pertinent circumstances and concluded that there was no additional pressure or coercion exerted on the Petitioner beyond his underlying confinement in prison.

As the foregoing review of the relevant Supreme Court decisions demonstrates, the state court's analysis and conclusion that Petitioner was not in custody for the purposes of Miranda was not contrary to, or an unreasonable application of, Supreme Court precedent that was clearly established at the time.

In the traverse, Petitioner argues that because the Supreme Court had not clearly established when Miranda warnings were required in the prison context, the state court's decision is contrary to, or an unreasonable application of, clearly established federal law. Petitioner's conclusion does not follow

from the absence of a precise decision on point. Further, as the foregoing analysis shows, the state court reasonably applied Miranda and its progeny by considering the totality of the pertinent circumstances to determine the extent of any coercion exerted on the Petitioner.

In sum, the state court's decision denying Petitioner's Miranda claim was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner's Miranda claim will be denied.

VII. Ineffective Assistance of Counsel

Petitioner contends that his trial counsel was ineffective for failing to move to exclude Petitioner's statements or to oppose the prosecutor's in limine motion to introduce Petitioner's statements as admissions and to resolve any Miranda issues. (Pet. 29-31.) Respondent addresses this issue in the answer. (Ans. 15.)

The law governing claims concerning ineffective assistance of counsel is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Premo v. Moore, –U.S. –, 131 S.Ct. 733, 737-38 (2011); Canales v. Roe, 151 F.3d 1226, 1229 n.2 (9th Cir. 1998).

To demonstrate ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments, a convicted defendant must show that 1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all the circumstances of the particular case; and 2) unless prejudice is presumed, it is reasonably probable that, but for counsel's errors, the result of

the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687-94 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). A petitioner must identify the acts or omissions of counsel that are alleged to have been deficient. Strickland, 466 U.S. at 690. This same standard is applied on direct appeal and in a motion for a new trial. Id. at 697-98.

In determining whether counsel’s conduct was deficient, a court should consider the overall performance of counsel from the perspective of counsel at the time of the representation. Strickland, 466 U.S. at 689. There is a strong presumption that counsel’s conduct was adequate and within the exercise of reasonable professional judgment and the wide range of reasonable professional assistance. Id. at 688-90. The challenger's burden is to show “that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.” Id. at 687.

In determining prejudice, a reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. Strickland, 466 U.S. at 694. In the context of a trial, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt. Id. at 695. This Court must consider the totality of the evidence before the fact finder and determine whether the substandard representation rendered the proceeding fundamentally unfair or the results unreliable. Id. at 687, 696.

Where the state court has applied the correct, clearly established federal law to a claim concerning the ineffective

assistance of counsel, a federal district court analyzes the claim under the "unreasonable application" clause of § 2254(d)(1), pursuant to which habeas relief is warranted where the correct law was unreasonably applied to the facts. Weighall v. Middle, 215 F.3d 1058, 1062-62 (2000) (citing Williams v. Taylor, 529 U.S. 362 (2000)).

The Supreme Court has described the high bar presented by § 2254(d)(1) for prevailing on a claim of ineffective assistance of counsel:

> "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' [Strickland,] 466 U.S., at 688 [104 S.Ct. 2052]. A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. Id., at 689 [104 S.Ct. 2052]. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Id., at 687 [104 S.Ct. 2052].
>
> "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' ...
>
> " 'Surmounting Strickland's high bar is never an easy task.' Padilla v. Kentucky, 559 U.S. ----, ---- [130 S.Ct. 1473, 1485, 176 L.Ed.2d 284] (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial proceedings], and so the Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690 [104 S.Ct. 2052]. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' Id., at 689 [104 S.Ct. 2052]; see also Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843,

> 152 L.Ed.2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S.Ct. 2052.
>
> "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both 'highly deferential,' id., at 689 [104 S.Ct. 2052]; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, Knowles, 556 U.S., at ----, 129 S.Ct., at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ---- [129 S.Ct., at 1420]. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."

Premo v. Moore, -U.S. -, 131 S.Ct. at 739-40 (quoting Harrington v. Richter, -U.S.-, 131 S.Ct. 770 (2011)).

Here, the state court concluded that Petitioner was not in custody and that Miranda warnings were not required; thus, counsel's failure to seek to exclude the evidence was not unreasonable or substandard.

As the foregoing analysis demonstrates, Petitioner's Miranda claim lacked merit. If counsel had moved to exclude Petitioner's statements, exclusion would not have been legally required. The failure to make a motion which would not have been successful or was otherwise futile does not constitute ineffective assistance of counsel. James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994).

Accordingly, the Court concludes that the state court's decision denying Petitioner's Sixth and Fourteenth Amendment claim of ineffective assistance of counsel was not contrary to,

or an unreasonable application of, clearly established federal law. Therefore, Petitioner's claim that counsel was ineffective for failing to object to the introduction of Petitioner's statements pursuant to Miranda v. Arizona will be denied.

VIII. Prosecutorial Misconduct

Petitioner argues that the prosecutor committed prejudicial misconduct and violated Petitioner's right to due process of law by misstating the reasonable doubt standard and by vouching for the sole prosecution witness.

A. The State Court Decision

The pertinent part of the CCA's decision is as follows:

> II. Claimed Prosecutorial Misconduct
>
> Next, defendant contends the prosecutor committed prejudicial misconduct by misstating and thereby lowering the burden of proof and by improperly vouching for the prosecution witness during closing argument. Again acknowledging he waived his claims by failing to object below, defendant contends defense counsel rendered ineffective assistance. We disagree.
>
> A. Misstating the Burden of Proof
>
> During final argument, the prosecutor made the following statements regarding reasonable doubt (the comments defendant finds objectionable are italicized): "Reasonable doubt. [¶] I am sure [defense counsel] is gonna get up and he's gonna talk about the burden of proof, beyond a reasonable doubt, and I understand that, that is my burden and I accept that, and I submit to you that I've proven it beyond a reasonable doubt, that the defendant possessed the weapon. [¶] The definition says that it's not a mere possible doubt, it's not, what if? [¶] It's not hypothetical. [¶] It's not maybe. [¶] *It's that state of the case which, after all of the evidence, that you have compared and considered, leaves you in a state of mind that you cannot say you don't have an abiding conviction of the truth.* [¶] What that means to me is, a week from now, you can look yourself in the mirror and say, yeah, I still think he did it. [¶] That's reasonable. [¶] *It's a standard that is used every day in every criminal case across the nation. [¶] It's not insurmountable, and not impossible, and it boils down to your common sense.* [¶] Was he in prison? [¶] And did he have a

weapon? [¶] And those are really the two elements, that's what I'm required to prove."

In rebuttal, the prosecutor argued: "They want you to believe that [Officer Quiram] lied about everything. [¶] Because that's the bottom line, that is what it comes down to. [¶] He would have to have been lying about the metal detector. [¶] He had to have been lying about his statement, or at least very confused. [¶] He had to be lying about the search of the cell. [¶] ... [¶] The only evidence that you heard from the witness stand is that two people had keys. [¶] Officer Quiram and his partner. [¶] And from the time he searched the cell at 2:00 a.m., until he put the defendant in it, nobody was in there. [¶] But the defense wants you to speculate. [¶] If you go on that issue, whether or not it's possible to conceal a weapon, they want you to guess. [¶] *Well, that's hypothetical, that's maybe, it's not reasonable doubt.* [¶] Look at that instruction. [¶] *It's not probable, it's not maybe, it has to be above that.* [¶] Now, ladies and gentlemen, reasonable is the burden. [¶] *The important thing to remember is, it's used every single day across the country. [¶] And you see the news channels, you see the newspapers, people are convicted every single day in courtrooms across America. [¶] Why? [¶] Because reasonable doubt is not insurmountable, it's a higher level of proof, but it is proveable. [¶] If it wasn't, no one would go to prison, we wouldn't have a prison system. [¶] No one would be convicted.* [¶] So, the bottom line, ladies and gentlemen is, do you believe Officer Quiram?"

Defendant contends that the prosecutor's comments had the effect of lowering the prosecutor's burden of proof by equating the reasonable doubt standard with "common sense" and the type of standard people use "every day" in making decisions. Defendant relies principally upon *People v. Nguyen* (1995) 40 Cal.App.4th 28 *(Nguyen)*.

In *Nguyen*, the prosecutor made the following statements to the jury during summation: "'The standard is reasonable doubt. That is the standard in every single criminal case. And the jails and prisons are full, ladies and gentlemen. [¶] It's a very reachable standard that you use every day in your lives when you make important decisions, decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving. If you have reasonable doubt that you're going to get in a car accident, you don't change lanes. [¶] So it's a standard that you apply in your life. It's a very high standard. And read that instruction, too. I won't paraphrase it because it's a very difficult instruction, but it's not an unattainable standard. It's the standard in every single criminal case.'" (*Nguyen*, *supra*, 40

Cal.App.4th at p. 35.)

The Nguyen court held that the prosecutor's argument was improper and "strongly disapprove[d] of arguments suggesting the reasonable doubt standard is used in daily life to decide such questions as whether to change lanes or marry." (*Nguyen*, *supra*, 40 Cal.App.4th at p. 36.) The court further held that the improper argument was harmless because the prosecutor directed the jury to read the reasonable doubt instruction and the jury was correctly instructed on the standard. (*Id.* at pp. 36-37.) For the same reasons, the failure of defense counsel to object to the prosecutor's statements did not constitute ineffective assistance of counsel. (*Id.* at p. 37.)

The prosecutor's statements in this case are very different from the remarks at issue in *Nguyen*. Here the prosecutor did not equate application of the reasonable doubt standard to decisions jurors make in daily life or compare the jury's task to any specific decision. Rather, he stated accurately that the reasonable doubt standard was used every day in criminal cases and described it as a higher level of proof. We also disagree with defendant that the prosecutor's reference to common sense improperly equated the reasonable doubt standard with everyday decisionmaking. When the prosecutor's remark is read in context, it becomes clear the prosecutor was arguing that the jury could use its common sense to determine that the facts shown by the prosecution's evidence satisfied the reasonable doubt standard, not that common sense could substitute for the reasonable doubt standard. This was fair argument. Finally, the prosecutor told the jury to look at the court's instruction on reasonable doubt and the court instructed the jury on the proper standard. *Nguyen* therefore leads us to conclude no rational juror would have been misled by the prosecutor's argument, and that any deficiency in defense counsel's failure to object was not prejudicial. (*Nguyen*, *supra*, 40 Cal.App.4th at pp. 36-37.)

In addition, we reject, as without merit, defendant's brief assertion that the prosecutor erroneously defined "reasonable doubt" when he stated: "It's that state of the case which, after all of the evidence, that you have compared and considered, leaves you in a state of mind that you cannot say you don't have an abiding conviction of the truth." When viewed in context, it is clear the prosecutor was not defining the phrase "reasonable doubt" but was trying to describe what the jury's state of mind would be if it found defendant guilty beyond a reasonable doubt. The prosecutor's use of negatives may have rendered his statement confusing but it was not a misstatement of the law.

B. Vouching for the Witness

In closing argument, the prosecutor made the following comments regarding the circumstance that Officer Quiram was the sole prosecution witness and the prosecutor's anticipation that the defense was going to challenge whether his testimony was enough to establish defendant's possession of the weapon (challenged comments are again italicized): "And some of you may be thinking, well, with only one witness, how could I find 'em guilty with just one witness? [¶] The law says that you can. [¶] ... [¶] What they are going to argue about is, did he possess the weapon or not? [¶] So, that's the decision you are going to have to make, when you go back into the jury room. [¶] Did he have the weapon or not? [¶] And the only evidence that you have heard, as I have indicated before, is that he did. [¶] ... [¶] So, the only evidence that you have is Officer Quiram's testimony. [¶] So, then, the question becomes, do you believe him? [¶] And it comes down to that. [¶] ... [¶] *So, I would submit to you, he has no reason to lie. [¶] I would also submit to you, he works for the state. [¶] It's not an easy job to come by, lots of people would like those kinds of working hours, maybe not his, but the benefits, retirement, everything, you know, that we know as citizens that public employees get, why would he lie for him? [¶] One defendant. [¶] When he has contact with hundreds . [¶] No one case is worth his credibility*. [¶] So, I submit to you, ladies and gentlemen, that he told the truth, told you what he could remember, told you the facts and the evidence, and you need to find the defendant guilty."

As the prosecutor predicted, the defense in closing argument tried to raise doubts as to Officer Quiram's credibility. Defense counsel suggested that it was not physically possible for defendant to have concealed the knife in his rectum. Defense counsel suggested that, contrary to the prosecutor's argument, Officer Quiram's job actually provided him an incentive to lie: to protect his job. Defense counsel suggested a more plausible theory was that the knife was in the holding cell the whole time and that Officer Quiram failed to discover it when he conducted his regular search of the cell at 2 a.m. To cover up his own failure to discover the knife, he placed the blame on defendant. FN4

FN4. For example, defense counsel argued: "Now, there was some suggestion that Mr., or, Correctional Officer Quiram, he has no reason to lie, why would he lie? [¶] Well, at first blush, I say, yeah, you are right, until he said it, I hadn't thought about it, but, he said it, so, I thought about it, let's see, great job, great benefits, he probably would like to make sure he has those tomorrow. [¶]

> And if you are the guy responsible for the two a.m. sweep of the cells, and you log that sweep, and there is a knife found in one of those cells, someone has got to be blamed. [¶] ... [¶] Someone has got to be blamed. [¶] It's either Mr. Quiram, or someone else. [¶] ... [¶] I don't think it's [a case] that goes with proof beyond a reasonable doubt. [¶] Too many open questions, protecting his job, it doesn't make sense. [¶] I mean, things do actually have to make sense. [¶] A lot of us think, oh, he must have been guilty, that makes sense. [¶] When the reality is, does it make sense that a man could have that thing in his rectum ... ? [¶] ... [¶] Could a weapon have been missed, even from his two o'clock sweep? [¶] Sure. [¶] He testified, contraband, weapons, all of that sort of thing are found in there, all the time, that was his testimony. [¶] If he missed it, he has to have a place to put it. [¶] And he put it squarely on [defendant.] [¶] Your job really is not an easy one, because, you have to figure out where the truth is, figure out all of these nuances. [¶] Figure out if somebody can actually put a Saran Wrapped knife that far up into their body cavity without being injured. [¶] ... [¶] This is not a delicate mechanism, it looks like a piece of brass to me, certainly a piece of metal, heavy metal, short point, no protection. [¶] Doesn't make sense. [¶] The thing that makes sense is that it was missed."

Defendant now contends that the prosecutor improperly vouched for Officer Quiram's credibility by suggesting, in defendant's words, that the officer "would not put such a good job at risk by lying." Accordingly, defendant argues defense counsel was ineffective for failing to object to the prosecutor's argument.

"A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] Nor is a prosecutor permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial. [Citation.] However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching. [Citations.]"

> (*People v. Frye* (1998) 18 Cal.4th 894, 971.)
>
> The prosecutor did not vouch for the truthfulness or accuracy of the officer's testimony when he essentially argued that in order to accept the defense theory, the jury would have to believe that the officer would lie about his observations of defendant and thereby risk his fledging (sic) career as a correctional officer. (*People v. Anderson* (1990) 52 Cal.3d 453, 479 [no improper prosecutorial vouching because the prosecutor limited her remarks to facts of record, namely, the years of experience of the officers involved, and the prosecutor's "vouching" was clearly based on inferences reasonably drawn therefrom, rather than on the prosecutor's personal belief or knowledge].) Here, the prosecutor argument was loosely based on facts in evidence-the officer's three-year employment with the Department of Corrections which began with a 16-week training academy. The prosecutor also appealed to the jurors' common perceptions about civil service employment and did not imply he had any personal knowledge or belief about Officer's Quiram that would support the officer's veracity as a witness.
>
> In any event, even if there was misconduct it was slight and not prejudicial. (See *People v. Padilla* (1995) 11 Cal.4th 891, 946 [prosecutor said in his closing argument that, had the officer lied, he would have risked his whole career of 17 years; court held that although the argument was probably improper, there was no reasonable probability the defendant was prejudiced]; *U.S. v. Martinez* (6th Cir.1992) 981 F.2d 867, 871 [prosecutor asked the jury why a detective would risk his 18-year police career by lying on the stand; court held the prosecutor's comment was simply an isolated misstatement which did not likely prejudice the defendant because any possible prejudice was ameliorated by the trial court's instruction to the jury that the lawyers' arguments are not evidence].)
>
> As we have already determined that the prosecutor committed no error, or any error did not result in prejudice, there can be no ineffective assistance due to defense counsel's failures to object. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1038.)

(LD 1, 6-12.)

B. Misstating the Burden of Proof

Petitioner argues that the prosecutor misstated and thereby lowered the government's burden of proof beyond a reasonable doubt. Petitioner points to 1) the prosecutor's statement

concerning the "state of the case" in which he used a double negative; 2) his repeated references to the use of the standard in every criminal case; 3) his statements minimizing the standard as provable and not insurmountable; and 4) what Petitioner describes as equating the standard with common sense.

A prosecutor's improper remarks violate the Constitution only if they so infect the trial with unfairness as to make the resulting conviction a denial of due process. Parker v. Matthews, – U.S. –, 132 S.Ct. 2148, 2153 (2012) (per curiam); see, Darden v. Wainwright, 477 U.S. 168, 181 (1986); Comer v. Schriro, 480 F.3d 960, 988 (9th Cir. 2007). Prosecutorial misconduct deprives the defendant of a fair trial as guaranteed by the Due Process Clause if it prejudicially affects the substantial rights of a defendant. United States v. Yarbrough, 852 F.2d 1522, 1539 (9th Cir. 1988) (citing Smith v. Phillips, 455 U.S. 209, 219 (1982)). However, the standard of review of claims concerning prosecutorial misconduct in proceedings pursuant to § 2254 is the narrow standard of due process, and not the broad exercise of supervisory power; improper argument does not, per se, violate a defendant's constitutional rights. Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (citing Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996)).

Here, many of the prosecutor's remarks constituted reasonable argument concerning how the jury should view the evidence and proceed to determine whether the reasonable doubt standard had been met. The state court reasonably concluded that the prosecutor did not equate the standard with common sense or everyday decision making, but rather asked the jury to use its

common sense. Further, in describing the use of the standard, the prosecutor did not contradict or dilute the standard. Describing the requirement as not insurmountable, not impossible, provable, and a higher level of proof was not incorrect.

The prosecutor's remark concerning the state of the case was arguably a misstatement of the reasonable doubt standard because a double negative was used. Further, if his statement about its having to be above maybe or probable is interpreted as a statement about the nature of the doubt itself, the statement was also arguably incorrect. However, the precise meaning of the remarks was unclear. Courts have recognized that the arguments of advocates are somewhat improvisational and must not be unduly restrained. "Counsel are given latitude in the presentation of closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." Ceja v. Stewart, 97 F.3d 1246, 1253-54 (9th Cir. 1996) (quoting United States v. Baker, 10 F.3d 1374, 1415 (9th Cir. 1993)). A reviewing court should consider challenged remarks in light of the realistic nature of closing arguments at trial. "Because 'improvisation frequently results in syntax left imperfect and meaning less than crystal clear,' 'a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" Williams v. Borg, 139 F.3d 737, 744 (9th Cir. 1998) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974)).

///

In determining whether remarks rendered a trial fundamentally unfair, a court must judge the remarks in the context of the entire proceeding to determine whether the argument influenced the jury's decision. Boyde v. California, 494 U.S. 370, 385 (1990); Darden v. Wainwright, 477 U.S. at 179-82. In Darden, the Court considered whether the prosecutor manipulated or misstated evidence, whether specific rights of the accused were implicated, the context of the remarks in light of both parties' arguments, the instructions given by the trial court, and the weight of the evidence. Darden, 477 U.S. at 179-82.

Here, the problematic remarks were isolated and did not misstate the evidence. They were made in a context of other, reasonable argument, and they were neutralized by the Court's instructions.[4] Further, even the prosecutor himself referred the

---

[4] A review of the transcript shows that the trial court instructed the jury that the facts must be determined from the evidence and not from any other source (2 RT 195); the jury must accept and follow the law as the court stated it, and if anything concerning the law that was said by the attorneys in their arguments or at any other time conflicted with the court's instructions, the jury must follow the instructions (id.); the jury was to be governed only by the instructions in their final wording (id. at 196); the jury was to consider the instructions as a whole and in light of all the others (id. at 197); and statements made by attorneys during the trial were not evidence (id.). Further, the jury was also informed of the presumption of innocence and the placement of the burden of proof on the government. (Id. at 205.) Reasonable doubt was defined as follows:

> It is not a mere possible doubt, because everything related to human affairs is open to some possible or imaginary doubt.
>
> It is that state of the case which, after the entire comparison and consideration of all of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

(Id.)

Defense counsel argued the need to prove the case beyond a reasonable doubt and that the burden of proof was not a minimal thing. He distinguished it as being higher than the civil standard of more probable than not, and he noted that it was the highest standard that Americans recognize with respect

jury to the reasonable doubt instruction. Isolated passages of a prosecutor's argument may not have a significant impact on the jury's deliberations where the jury is informed in advance that they are matters of opinion and not evidence. Donnelly v. DeChristoforo, 416 U.S. at 646. Instructing the jury that lawyers' comments and argument are not evidence can cure the harmful effect of isolated instances of improper argument, Sassounian v. Roe, 230 F.3d 1097, 1107 (9th Cir. 2000); arguments of counsel carry less weight with a jury than do instructions from the court, Boyde v. California, 494 U.S. at 384-85.

The state court thus reasonably concluded that a rational juror would not have been misled or confused, and that the Petitioner was not prejudiced by any failure of defense counsel to object. The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law.

C. Vouching

Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony. United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993). Vouching for the credibility of a witness or expressing a personal opinion concerning the accused's guilt can pose two dangers. First, it can convey the impression that evidence known by the prosecutor but not presented to the jury supports the charges, and thus it

---

to proof, requiring very persuasive evidence. (Id. at 224-25.) He argued that the absence of a videotaped record, fingerprints, and DNA evidence prevented the prosecution from meeting its high burden of proof. (Id. at 232-33.)

can jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury. United States v. Young, 470 U.S. 1, 18 (1985). Second, the prosecutor's opinion reflects the imprimatur of the government and may induce the jury to trust the government's judgment rather than its own assessment of the evidence. Id. at 18-19.

When a prosecutor engages in argument that violates the ethical principle that a lawyer not express a personal belief or opinion in the truth or falsity of any testimony or evidence, the violation must be viewed in context to determine whether the prosecutor's conduct affected the fairness of the trial. United States v. Young, 470 U.S. at 10-11. To determine whether prejudicial error occurred, a court must consider the probable effect of the prosecutor's argument on the jury's ability to judge the evidence fairly. Id. at 12. Vouching for a witness's credibility is more likely to be damaging where the credibility of the witness is crucial. United States v. Edwards, 154 F.3d 915, 921 (9th Cir. 1998). The standard of Darden v. Wainwright is a very general one that leaves courts with more leeway in reaching outcomes in case-by-case determinations. Parker v. Matthews, 132 S.Ct. at 2155 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Furthermore, prosecutors may argue reasonable inferences based on the evidence, including that one of the two sides is lying. United States v. Necoechea, 986 F.2d at 1276. Here, the prosecutor's remarks concerning Officer Quiram's working for the state and lack of motivation to lie were isolated, and the state court reasonably concluded that the argument was based on record

facts and inferences reasonably drawn therefrom, as distinct from any personal knowledge or belief of the prosecutor. Defense counsel was permitted to argue that contrary to the prosecutor's argument, the officer's job provided a motivation to lie.[5]

The Court concludes that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law concerning a due process claim of prosecutorial misconduct. The state court's rejection of the prosecutorial misconduct claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Parker v. Matthews, 132 S.Ct at 2155 (quoting Harrington v. Richter, 131 S.Ct. at 767-87).

Considering all the conduct argued to be prosecutorial misconduct in light of the totality of the circumstances, the Court concludes that the state court's decision finding no fundamental unfairness or denial of due process was not contrary

---

[5] The prosecutor argued that the correctional officer had no reason to lie because he would retain his job and lifestyle regardless of the jury's ultimate verdict; further, to lie would jeopardize his excellent job with the state because it would risk or compromise his credibility. (2 RT 222.)

In response, defense counsel argued that if one were the officer responsible for a sweep of the holding cell and logged the sweep, and further if a knife were found in one of the cells, someone "has got to be blamed." (Id. at 228.) The trial court overruled the prosecutor's objection to this line of argument because the prosecutor had raised it in argument, and the defense was entitled to respond to it. (Id.) Defense counsel suggested that the officer could have stood close to the metal detector to obtain a false alert in an effort to protect his job. (Id. at 229.)

In his final closing, the prosecutor argued that the lack of privacy in prison resulted in inmates' carrying weapons in unusual places. In light of the continuing problem of weapons in prison, as reflected in the news, the exercise of common sense made it possible and sensible to believe that an inmate would conceal a knife in his rectum. (Id. at 235.) The prosecutor characterized the defense's argument that the officer was lying as speculation, and made statements concerning reasonable doubt, hypotheticals, and probability that are objected to by Petitioner in this proceeding. (Id. at 236-37.) The prosecutor then argued that it made sense that the activation of the metal detector was followed by discovery of a weapon from the Petitioner's rectum. (Id. at 238.)

to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner's prosecutorial misconduct claim will be denied.

IX. Ineffective Assistance of Counsel

As the foregoing analysis shows, Petitioner's due process claims based on prosecutorial misconduct were not meritorious. If counsel had objected to all the challenged statements, some of the objections would have been overruled. To the extent that any of the prosecutor's remarks were technically misconduct, an admonition or repetition of the pertinent instructions would have cured any harm. The evidence against Petitioner was strong. When viewed in context, even in the absence of objection and admonition, the remarks were not such as would have rendered a more favorable result reasonably probable or resulted in unfairness to Petitioner.

The Court concludes that the state court's decision denying Petitioner's Sixth and Fourteenth Amendment claim of ineffective assistance of counsel relating to prosecutorial misconduct was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner's claim of ineffective assistance of counsel relating to prosecutorial misconduct will be denied.

X. Cumulative Error

Petitioner argues that the cumulative impact of all the errors deprived him of a fair trial.

A. The State Court Decision

The pertinent portion of the CCA's decision was as follows:

III. Cumulative Error

> Defendant contends that the cumulative impact of all of the claimed errors deprived him of a fair trial. We have either rejected defendant's claims of error and/or found any errors to not be prejudicial on an individual basis. Viewing the errors as a whole, we find that the errors do not warrant reversal of the judgment. (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

(LD 1, 12.)

B. Analysis

The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair, even though no single error rises to the level of a constitutional violation or would independently warrant reversal. Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Chambers v. Mississippi, 410 U.S. 284, 298, 302-03 (1973)). Traditional principles of due process provide that cumulative errors warrant habeas relief only where the errors have so infected the trial with unfairness that the resulting conviction denies due process, such as where the combined effect of the errors had a substantial and injurious effect or influence on the jury's verdict, id. (citing Donnelly v. DeChristoforo, 416 U.S. at 643 and Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)), and where the combined effect of individually harmless errors renders a criminal defense far less persuasive than it might otherwise have been, id. (citing Chambers, 410 U.S. at 294, 302-03).

In evaluating a due process challenge based on the cumulative effect of multiple trial errors, a reviewing court must determine the relative harm caused by the errors. If the evidence of guilt is otherwise overwhelming, the errors are considered "harmless," and the conviction will generally be

affirmed. Parle v. Runnels, 505 F.3d at 927-28. The overall strength of the prosecution's case must be considered because where the government's case on a critical element is weak, or where the verdict or conclusion is only weakly supported by the record, it is more likely that trial errors will be prejudicial to the defendant. Id. at 928.

Here, the evidence against Petitioner was very strong. Officer Quiram's testimony established the pertinent search procedures, and the officer had personally conducted the search of the holding cell in which the knife was found to have been inside Petitioner. Quiram's testimony established that the LED indicator on the metal detector indicated something in the approximate area where it was found to have been secreted, and Petitioner himself removed the object from his rectum. To the extent that any error occurred at all, it was not prejudicial.

The state court's decision that cumulative error did not deprive Petitioner of a fundamentally fair trial was not contrary to, or an unreasonable application of, any clearly established federal law. Accordingly, Petitioner's cumulative error claim will be denied.

XI. Request for an Evidentiary Hearing

Petitioner requests an evidentiary hearing with respect to "all matters in question." (Doc. 34, 47.)

The decision to grant an evidentiary hearing is generally a matter left to the sound discretion of the district courts. 28 U.S.C. § 2254; Habeas Rule 8(a); Schriro v. Landrigan, 550 U.S. 465, 473 (2007). To obtain an evidentiary hearing in federal court under the AEDPA, a petitioner must allege a colorable claim

by alleging disputed facts which, if proved, would entitle him to relief. Schriro v. Landrigan, 550 U.S. at 474.

The determination of entitlement to relief is, in turn, is limited by 28 U.S.C. § 2254(d)(1), which requires that to obtain relief with respect to a claim adjudicated on the merits in state court, the adjudication must result in a decision that was either contrary to, or an unreasonable application of, clearly established federal law. Schriro v. Landrigan, 550 U.S. at 474. Further, in analyzing a claim pursuant to § 2254(d)(1), a federal court is limited to the record that was before the state court that adjudicated the claim on the merits. Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011).

Thus, when a state court record precludes habeas relief under the limitations set forth in § 2254(d), a district court is not required to hold an evidentiary hearing. Cullen v. Pinholster, 131 S.Ct. 1388, 1399 (2011) (citing Schriro v. Landrigan, 550 U.S. 465, 474 (2007)).

As the foregoing analysis shows, the Court has concluded that habeas corpus relief is precluded under the limitations set forth in § 2254(d)(1). Accordingly, an evidentiary hearing is not required, and Petitioner's request will be denied.

XII. Certificate of Appealability

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the Court of Appeals from the final order in a habeas proceeding in which the detention complained of arises out of process issued by a state court. 28 U.S.C. § 2253(c)(1)(A); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). A certificate of appealability may issue

only if the applicant makes a substantial showing of the denial of a constitutional right. § 2253(c)(2). Under this standard, a petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. Miller-El v. Cockrell, 537 U.S. at 336 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). A certificate should issue if the Petitioner shows that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in any procedural ruling. Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of the claims in the habeas petition, generally assesses their merits, and determines whether the resolution was debatable among jurists of reason or wrong. Id. It is necessary for an applicant to show more than an absence of frivolity or the existence of mere good faith; however, it is not necessary for an applicant to show that the appeal will succeed. Miller-El v. Cockrell, 537 U.S. at 338.

A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Rule 11(a) of the Rules Governing Section 2254 Cases.

Here, it does not appear that reasonable jurists could debate whether the petition should have been resolved in a different manner. Petitioner has not made a substantial showing of the denial of a constitutional right.

Accordingly, the Court will decline to issue a certificate of appealability.

XIII. Disposition

Petitioner raised additional claims in the second amended petition, but those claims were previously dismissed pursuant to Respondent's motion to dismiss.

Therefore, in accordance with the foregoing analysis, it is ORDERED that:

1) Daniel Paramo, Acting Warden, is SUBSTITUTED as Respondent; and

2) The second amended petition for writ of habeas corpus is DENIED; and

3) Petitioner's request for an evidentiary hearing is DENIED; and

4) The Clerk is DIRECTED to enter judgment for Respondent; and

5) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

**Dated: July 26, 2012**

**/s/ Sheila K. Oberto**
UNITED STATES MAGISTRATE JUDGE